TECUMSEH CORRUGATED BOX CO., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26458-88.          Filed March 12, 1990.

*Stephen M. Feldman* and *Sheldon A. Fealk,* for the petitioner.
*Margaret A. Satko,* for the respondent.

COHEN, *Judge:* Respondent determined deficiencies of $11,516.14 and $1,167,201.84 in petitioner's Federal income taxes for the fiscal years ended October 31, 1984 and 1985, respectively. The sole issue for decision is whether section 453(e) applies to certain sales of real property by petitioner.

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Tecumseh Corrugated Box Co. (petitioner) was a corporation with its principal place of business in Tecumseh, Michigan, at the time it filed its petition. Petitioner was incorporated on January 25, 1963, uses the accrual method of accounting, and reports its income on the basis of a fiscal year ending October 31.

Since its incorporation, petitioner has been engaged in the manufacturing and selling of corrugated containers. Between 1972 and 1985, petitioner conducted paper milling and box manufacturing operations at its Jaite Mill plant located near Cleveland, Ohio. The paper mill manufactured cardboard from pulp and other raw materials. This cardboard was sold to petitioner's other divisions and to other box fabricators. The box operation produced boxes for sale.

The paper mill, which was constructed in 1905, was the anchor of the Jaite Mill Historic District. This mill, which originally produced paper sacks from rags and rope, recycled cardboard boxes into high quality kraft paper. Petitioner's other divisions molded the paper and used it for the middle layer of the corrugated cardboard boxes that it manufactured.

In 1979, the machinery and equipment comprising the Jaite Mill plant were entered in the National Register of Historic Places by the Heritage Conservation and Recreation Service, U.S. Department of the Interior. None of petitioner's box plant equipment had any historical significance.

Petitioner's stockholders during the years in issue were as follows:

| Stockholders | Shares | | | Percentage of total |
| --- | --- | --- | --- | --- |
| | A Stock | B Stock | Total | |
| J.J. Robideau Living Trust | 97,350 | 99,722 | 197,072 | 7.95% |
| G.E. Robideau Living Trust | 4,400 | 13,200 | 17,600 | .70 |
| J.A. Robideau Living Trust | 28,600 | 305,800 | 334,400 | 13.49 |
| Margaret A. Robideau | 28,600 | 305,800 | 334,400 | 13.49 |
| Jeffrey T. Robideau | 28,600 | 305,800 | 334,400 | 13.49 |
| J.J. Robideau Irrev. Trust #1 | - - - | 968,000 | 968,000 | 39.09 |
| J.J. Robideau Irrev. Trust #2 | - - - | 242,000 | 242,000 | 9.79 |
| The Robideau Foundation | - - - | 49,548 | 49,548 | 2.00 |
| | 187,550 | 2,289,870 | 2,477,420 | 100.00 |

On December 27, 1974, Congress enacted Public Law 93-555 (the act), which formally established the Cuyahoga Valley National Recreation Area (Cuyahoga). Act of December 27, 1974, Pub. L. 93-555, 88 Stat. 1784, 16 U.S.C. sec. 460ff. The act provided that the land necessary to create Cuyahoga would be acquired "by donation, purchase with donated or appropriated funds, exchange, or transfer" within 6 years from the date of enactment. In 1974, the Federal Government also developed a program to acquire properties in and near Cuyahoga. Petitioner's Jaite Mill plant, including the box plant and certain other properties, was located within the boundaries of Cuyahoga.

Congress appropriated $34,500,000 for the acquisition of lands within Cuyahoga and later increased the appropriation to $70,100,000. The funds that were appropriated by Congress were not designated to be used to purchase specific property. Rather, the Secretary of the Interior established an acquisition plan that indicated the order in which property would be acquired with the funds appropriated.

The U.S. Government has the power to condemn property. The act, however, did not give the Department of the Interior authority to condemn property. In order for property to be condemned for Cuyahoga, congressional approval was necessary.

The methods available to the Government for acquisition of property include: (1) Legislative taking, where title to property transfers to the Government the moment legislation is signed; (2) negotiation, where the landowner and the acquiring agency arrive at a mutually agreeable price without litigation; (3) declaration of taking, where the Government, after reaching an impasse with the landowner, deposits with the court the funds determined to be the just compensation for the property to be acquired; and (4) complaint in condemnation, where the Government, after reaching an impasse with the landowner, files a complaint in a U.S. District Court and a jury determines the just compensation for the property.

Petitioner was aware of the act and, at various meetings of its board of directors, discussed the possibility that its property would be condemned. As early as May 1974, petitioner was aware of the possibility that the Jaite Mill

and Cleveland box plants and surrounding property would be acquired by the National Park Service for Cuyahoga. In May 1974, petitioner retained Ernest Genovese (Genovese), a local attorney, to advise petitioner regarding the possible acquisition of real estate by the National Park Service.

In 1975, petitioner was contacted by William Birdsell (Birdsell), park superintendent of Cuyahoga, who advised petitioner of the Government's plan to acquire properties owned by petitioner in and around Cuyahoga, including the Jaite Mill and Cleveland box plants. Petitioner was also advised by the Army Corps of Engineers that the plan projected acquisition of the Jaite Mill and Cleveland box plants for 1980, the last year of acquisition.

The National Park Service established a priority list with respect to the order in which properties would be acquired. Petitioner knew that its properties were assigned a low priority in connection with the acquisition plan. Petitioner was also aware that acquisition of its properties was dependent upon congressional appropriations and that delays due to lack of funding could occur.

Petitioner was anxious to sell its Jaite Mill and Cleveland box plants. As early as 1975, petitioner looked for prospective purchasers for the Jaite Mill plant, but those contacted were not interested.

Beginning in 1975, Genovese attempted to get the National Park Service to acquire petitioner's properties earlier than scheduled. In July 1976, Genovese contacted U.S. Congressman John F. Seiberling for assistance. Congressman Seiberling reviewed the reasons given by the National Park Service for late acquisition of petitioner's properties and concurred with its position.

By letter dated December 15, 1977, Genovese attempted to persuade the National Park Service to provide for an early acquisition of petitioner's properties. Section 2(g) of the act provides that:

> In exercising his authority to acquire property under this Act, the Secretary shall give prompt and careful consideration to any offer made by an individual owning property within the recreation area to sell such property, if such individual notifies the Secretary that the continued ownership of such property is causing, or would result in, undue hardship. [Pub. L. 93-555, 88 Stat. 1786.]

In January 1978, appraisers and land acquisition officers for the National Park Service made a preliminary inspection of petitioner's property prior to requesting bids for an appraisal. The appraisal was never ordered.

In March 1978, petitioner purchased land in Twinsburg, Ohio, with the intent of constructing a new building to replace the Cleveland box plant that was to be acquired by the National Park Service. During March, April, and May 1978, Genovese, on behalf of petitioner, vigorously attempted to get the National Park Service to acquire its properties as soon as possible.

In early 1978, petitioner retained counsel for a review and determination of the potential tax effects of the sale of its properties to the Federal Government. Specifically, petitioner requested advice on whether it could defer realizing income for Federal income tax purposes from the receipt of the proceeds from the sale of its properties. Petitioner's tax counsel suggested that petitioner obtain a private letter ruling for a determination of the possibility of electing to defer the realization of gain pursuant to section 1033. Petitioner did not pursue this advice.

By letter dated June 26, 1978, Birdsell advised Genovese that: "As discussed with you previously, our plans have not changed; when acquisition of this property will occur has not been finalized. However, it is unlikely that acquisition will take place before late in fiscal year 1980 (fiscal year 1980 begins October 1, 1979)."

In early 1979, the National Park Service developed a proposal to divide petitioner's properties into five parcels. Pursuant to this proposal, the National Park Service would purchase the four small, unimproved parcels but not the more expensive parcel containing the Jaite Mill and Cleveland box plants. Petitioner objected to the acquisition of anything other than the entire property and declined the National Park Service's proposal in 1979 and again in 1981. By July 1979, petitioner was aware that its properties were not scheduled to be purchased in 1980. By April 1980, petitioner was aware that the Government had halted all purchases of property for Cuyahoga because of lack of funds.

In a letter to Genovese dated November 7, 1979, James J. Robideau (Robideau), petitioner's president, explained that petitioner was having serious labor problems due to the uncertainty of acquisition by the National Park Service. These labor problems included high employee turnover, defective products, serious absenteeism, and unfavorable contract terms. Robideau also noted that regular, longstanding customers were beginning to turn elsewhere because of this uncertainty.

In December 1980, the Environmental Protection Agency (EPA) cited petitioner for violations with respect to its oil-fired boiler system and waste water treatment facilities at the Jaite Mill plant. Petitioner installed new gas-fired boilers in response to the EPA's actions. To settle the matter with EPA, petitioner signed a consent decree and paid a $4,500 fine.

By September 1981, the uncertainty of the acquisition was impeding petitioner's ability to negotiate contracts of any duration with regular and potential customers. Due to these circumstances, petitioner intended to claim hardship in an attempt to expedite the acquisition of its property by the National Park Service. In a letter dated November 4, 1981, the National Park Service confirmed its agreement to an acquisition strategy for petitioner's properties. Pursuant to this strategy, the Government intended to subdivide petitioner's property into five parcels and to purchase the four unimproved parcels "on a one-per-year" basis "as soon as funds are available and the required surveys and appraisals are completed." Acquisition of the fifth parcel, which included the mill and associated structures, would be "postponed until appropriations for that purpose are available." The property was to be divided in order to facilitate Government acquisition of the smaller, less expensive parcels.

By letter dated July 20, 1982, petitioner was advised that the National Park Service was ordering appraisals of the four small, unimproved parcels. These appraisals were in fact ordered. Because of continued economic problems during 1982, petitioner weighed the possibility of continuing the operations at the Jaite Mill facilities versus the cost of shutting down the paper mill and box plant.

In early 1983, petitioner began negotiating with the National Park Service with respect to the piecemeal acquisition strategy. By March 16, 1983, petitioner and the National Park Service had agreed that the four small parcels would be purchased in 1983. On the same date, petitioner and the National Park Service reached an agreement in principle that the remaining parcel containing the paper mill and box plant would be purchased in 1984, if funds were available.

In May 1983, petitioner began soliciting preliminary figures for construction of a replacement facility for the box plant on property already owned by petitioner in Twinsburg, Ohio. Also in May 1983, petitioner ordered an appraisal of the four small parcels by S.M. Dix & Associates, Inc. (Dix). In July 1983, National Park Service personnel toured the paper mill and box plant in preparation for the acquisition.

Prior to September 1, 1983, the National Park Service offered to purchase the four small parcels for a total price of $219,500. Despite Genovese's recommendation to accept this offer, petitioner rejected the offer and made no counter offer. Petitioner, however, took action intended to force immediate condemnation of its properties.

In an attempt to force the United States to acquire all the parcels, including the Jaite Mill and Cleveland box plants, petitioner executed a topsoil removal agreement with a commercial topsoil marketing company. Removal of topsoil would have required clear-cutting trees and other vegetation, causing extensive damage to the land. The act prohibits removal of topsoil and cutting of timber to the detriment of the land.

On September 15, 1983, the National Park Service petitioned Congress to authorize a declaration of taking of the four small, unimproved parcels to prevent removal of the topsoil and timber. Congress, however, denied the National Park Service the authority to file the requested declaration of taking.

Prior to September 17, 1983, petitioner was visited by an EPA inspector and received another citation regarding the paper mill operation. On September 17, 1983, Genovese met with Congressman Seiberling and representatives of the

National Park Service. The results of this meeting were reported to petitioner's board of directors on September 21, 1983, and recorded in the corporate minutes as follows:

(a.) The Chairman and the Appropriation committee will introduce a special bill for the purchase of the property, stressing the fact they needed to buy the land first.

(b.) That the agreement will be in writing and the Park Authority would do the following:

(1) Will provide [petitioner] with a time table (approximately 6 months)

(2) Put in motion a request to receive appraisals (30 days)

(3) An additional 30 days to pick the appraisal

(4) 120 days to get all the numbers together

(5) 30 days to make recommendation to Congress

(6) They would write the EPA and inform them that they are going to buy the land within sixty (60) days, providing [petitioner] agreed to sell the land right now.

On September 22, 1983, petitioner agreed to sell to the U.S. Department of the Interior the four small, unimproved parcels of land for a total price of $235,375. On the advice of Genovese, petitioner considered the sale an involuntary conversion. As of November 22, 1983, petitioner considered that the four small, unimproved parcels had been sold to the Government, although payment had not yet been received. As of that date, petitioner also anticipated that its remaining property would be sold by June 1984.

Petitioner's labor problems were caused by employee uncertainty over the purchase of the plant by the National Park Service. Due to these continuing labor problems, petitioner consulted with Donald Lansky (Lansky), labor counsel, on potential methods to circumvent or eliminate the labor union and its collective bargaining agreement. In a memorandum from Lansky dated January 19, 1984, petitioner received advice concerning the basic principles of successorship and alter ego employers to be considered in evaluating the risks and methods of structuring the sale of a family business. The memorandum noted that:

Normally, where assets are purchased, the issue is whether the buyer is a "successor employer" who is obligated to bargain with the seller's union(s). * * * The determination of the successorship issue is based on whether the identity of the employing enterprise remains intact. The result of being a successor is that the buyer is then required to recognize

and bargain with the union that had represented the predecessor's employees. * * *

* * * * * * *

The NLRB will find alter ego status "where the two enterprises 'have substantially identical' management, business purpose, operation, equipment, customers and supervision, as well as ownership." * * *

The threshold question to be determined in alter ego cases is whether there is common ownership or control. In this respect, the existence of a family relationship between the new and old owners has been considered by the NLRB as an important factor in finding common ownership and in denying the existence of an arm's length transaction on the sale. * * *

* * * * * * *

To avoid the risks of being considered an alter ego, it is, therefore, imperative to maximize the differences between the old and new entities. In this respect, it may be helpful to have a complete cessation of operations of the existing company before the new entity is established to take over. Even here, however, where this is a mask for avoiding labor law obligations, the NLRB will not treat the transaction as being at "arm's length."

Despite this advice, petitioner did not restructure its operations with new lines of production, injection of capital and equipment, and changes in management or supervision. Petitioner was subsequently advised by different labor counsel that it could not avoid or eliminate the collective bargaining unit by structuring a sale of its property to another related entity.

By letter dated February 8, 1984, the National Park Service advised petitioner that it had advertised for the services of an appraiser to appraise petitioner's remaining property. The advertisement projected awarding the contract for appraisal by April 1, 1984, with a 120-day delivery schedule. At that time, the parties understood that a written appraisal would be delivered in August 1984.

Petitioner transferred the four small, unimproved parcels of land to the United States by warranty deed dated February 17, 1984, as follows:

| Tract | Acreage | Purchase price |
|-------|---------|----------------|
| 107-110 | 23.71 | $118,500 |
| 107-111 | .82 | 2,000 |
| 107-114 | 15.00 | 57,500 |
| 107-116 | 11.47 | 57,375 |
| Total | 51.00 | 235,375 |

After the February 1984 sale, petitioner owned Tract No. 107-117 containing 59.59 acres of land. Prior to September 1983, Tract Nos. 107-110, 107-111, 107-114, 107-116, and 107-117 were all one large parcel of land owned by petitioner. The five tracts were interdependent, and the Government intended to acquire all of them.

By letter dated March 16, 1984, the EPA gave petitioner an extension allowing it to operate the Jaite Mill plant until September 15, 1984, without curing its waste water violations. Subsequently, the EPA agreed to allow petitioner to operate the paper mill until November 15, 1984. Petitioner agreed to close permanently its paper mill operations at that time unless all its pollution problems were corrected. The EPA's extension was based on the EPA's understanding that the National Park Service would deliver an appraisal of petitioner's property by September 1, 1984, and would complete the purchase of petitioner's property no later than January 1, 1985.

Petitioner retained Dix to provide an appraisal of its remaining property for sale to the Government. On May 22, 1984, appraisers from Dix conducted an inspection of petitioner's real and personal property within Cuyahoga. On July 13, 1984, the appraiser obtained by the United States, Keystone Appraisal Co. (Keystone), also inspected petitioner's Cuyahoga property. The appraisers from Keystone were accompanied by representatives of petitioner during their inspection of petitioner's property.

On May 31, 1984, petitioner entered into a land contract (the first disposition) to sell its remaining properties within Cuyahoga, including buildings, machinery, equipment, and trade fixtures, to the James J. Robideau Irrevocable Trust Number One and the James J. Robideau Irrevocable Trust Number Two (the trusts). As of May 31, 1984, petitioner did not have a written appraisal of its property. Under the terms of the contract, petitioner as seller and the trusts as purchaser agreed:

(k) That the full consideration for the sale of the land to the Purchaser shall be the price at which the property is finally acquired by the United States Department of the Interior, National Park Services, Cuyahoga Valley National Recreation Area, of which the sum of Ten Thousand Dollars ($10,000) will be paid to the Seller at the time that such price is

so determined. The balance of such purchase price shall be paid to the Seller with interest thereon from the date hereof at the rate of nine percent (9%) per annum while Purchaser is not in default, and at the rate of nine percent (9%) per annum during the period of any default in payment. Such additional purchase price shall be paid over a period of fifteen (15) years, in equal annual installments including interest at the aforesaid rate of nine percent (9%) per annum, commencing on the anniversary date hereof and annually thereafter until paid in full; such payments to be applied first upon interest and then the balance on principal. Provided, however, the Purchaser shall have the right to prepay all or any part of the unpaid principal balance with accrued interest at any time without penalty.

*    *    *    *    *    *    *

(n) In the event that there arises any Federal and/or State income tax liability to the seller due to any subsequent disposition of the subject property by the Purchaser, Purchaser agree [sic] to make, in addition to any other required payments, a payment to Seller sufficient to cover said tax liability, and any interest and penalty thereon. Payment shall be made by Purchaser within the time limit specified by the appropriate taxing authority for payment of any such tax liability of the Seller.

(o) In addition to the land described in Paragraph 1, the herein contemplated sale shall include all machinery, equipment and trade fixtures located in, on, attached or appurtenant to the said land, buildings and improvements thereto, and all of the oil, gas and other minerals, and the constituents thereof, owned by the Seller in and under the said land, or wheresoever located * * *

Contemporaneously with execution of the land contract on May 31, 1984, the Trusts executed an assignment of the land contract to the J.M.J. Development Co. (the partnership) for "the full consideration of One Dollar ($1.00) and no other consideration." The partnership, as assignee, agreed to assume and to pay the indebtedness under the land contract. Also on May 31, 1984, the partnership filed for recording a memorandum of land contract with the Summit County, Ohio, Registrar of Deeds.

The partnership was formed June 5, 1980, effective as of November 30, 1979, by the J.J. Robideau Irrevocable Trust Number One and the James J. Robideau Irrevocable Trust Number Two. The James J. Robideau Irrevocable Trust Number One owned an 80-percent interest in the capital of the partnership, and the James J. Robideau Irrevocable Trust Number Two owned a 20-percent interest in the capital of the partnership. (The parties have stipulated that

petitioner, James J. Robideau Irrevocable Trust Number One, James J. Robideau Irrevocable Trust Number Two, and J.M.J. Development Co. are "related persons" within the meaning of sections 453(e)(1) and (f)(1).)

By lease dated June 28, 1982, the partnership held oil and gas rights under the Jaite Mill and Cleveland box plants and surrounding property. The partnership agreement provides that distributions to the partners of net operating profits of the partnership shall be made at such times as the partners shall reasonably agree.

Pursuant to a lease dated May 31, 1984, the partnership leased the property, machinery, and equipment back to petitioner. On its U.S. partnership return of income, the partnership reported gross rental income of $121,855 and $614,463 for 1984 and 1985, respectively.

By letter dated September 20, 1984, Genovese again attempted to persuade Congressman Seiberling that petitioner was suffering a severe hardship due to the delay by the National Park Service in acquiring the property. Genovese referred to petitioner as the owner of the property; the partnership was not mentioned.

Genovese represented both petitioner and the partnership in connection with the sale of the property. By letter dated November 13, 1984, Genovese, on behalf of petitioner, advised the National Park Service that "my client, Tecumseh Corrugated Box Company, is prepared to sell all of its assets * * * for the sum of $4,500,000.00, payable $2,000,000.00 this year, and the balance of $2,500,000.00 when the funds are available for said acquisition." Sale of the property to the National Park Service was approved by Robideau, as petitioner's president, and by petitioner's board of directors.

By letter dated November 27, 1984, J.W. Blanton, Jr. (Blanton), land resource officer, Cuyahoga Valley Land Acquisition Office, National Park Service, notified Genovese that petitioner's offer was acceptable subject to an approved appraisal of not less than $4,500,000. Blanton also enclosed a corporate offer to sell real property requiring the signatures of all principals, including corporate officers of petitioner and the partnership. The National Park Service

also required a corporate resolution by petitioner authorizing its officers to sell the property to the United States.

As of December 5, 1984, petitioner considered that the remaining parcel of improved real estate had been sold to the Federal Government. (The parties consistently refer to the sale as "the December 1984 sale," although title did not pass until January 1985.) By corporate warranty deed dated January 16, 1985, petitioner and the partnership, as grantors, transferred title to the property to the United States (the second disposition) for the total sum of $4,500,000, payable $2 million at closing and $2,500,000 on or before December 1, 1985.

After acquisition of the property by the United States, the paper mill operation was discontinued and only the box plant was continued. By December 1984, petitioner was operating its box plant in new quarters. Approximately $1,460,000 was expended to construct a building to replace the operations performed at the box manufacturing business. The employees of the box plant continued the same union representation.

At the time of the first disposition of the property on May 31, 1984, petitioner recorded the sale of the property as a land contract receivable of $2 million from the partnership. Subsequently, an adjusting journal entry was recorded on petitioner's books and records for the fiscal year ended October 31, 1984, to reflect an additional land contract receivable from the partnership. On its U.S. corporation income tax return for the fiscal year ended October 31, 1984, petitioner elected to report gain on the sale of its property to the trusts on the installment method. On its 1984 income tax return, petitioner also reported principal payments of $64,188 received from the partnership.

In the notes to its financial statements for the fiscal year ended October 31, 1984, petitioner disclosed the land contract and lease as follows:

NOTE 6: RELATED PARTY TRANSACTIONS

The Company is leasing or renting trailers, automobiles, computer equipment, and a maintenance facility from a corporation owned and operated by the immediate family of the President and major stockholder of the Company. The current monthly charge under these arrangements

is $19,279. The total payments to this related party during the year amounted to $218,795. These leasing arrangements are classified as operating leases.

The Company has two land contracts receivable from a partnership whose partners are irrevocable trusts created for the benefit of the children of the President of the Company. The land contracts receivable are payable over the next six to fifteen years with interest at six to eleven percent per annum.

\* \* \* \* \* \* \*

NOTE 9: EXTRAORDINARY ITEM

The Company sold its Jaite facility and equipment on May 31, 1984 to a partnership whose partners are irrevocable trusts as discussed in note 6. The total selling price of $4,050,000 [sic] is contingent upon the subsequent sale of the property by the partnership to the United States Department of the Interior. The amount has been reported as an extraordinary item since it is of an unusual nature and is not expected to occur again. The amount has been reported at the net of the applicable income taxes of $1,433,604.

The partnership received payments from the United States in the amounts of $2 million and $2,500,000 on January 18, 1985, and May 3, 1985, respectively. On its 1985 Federal income tax return, the partnership reported a sale of the property on January 16, 1985, and reported gain of $251,667. The amount of gain reported by the partnership was equal to the depreciation on the property, machinery, and equipment claimed from May 31, 1984, through January 16, 1985.

On its 1985 income tax return, petitioner reported principal payments of $138,884 received from the partnership. Also on its 1985 income tax return, petitioner reported a net long-term capital loss of $14,950. Petitioner elected to carryback the net capital loss to its fiscal year ended October 31, 1984, and claimed a $4,186 decrease in tax.

In the notes to its financial statements for the fiscal year ended October 31, 1985, petitioner disclosed the sale of its Cuyahoga property as follows:

NOTE 9: EXTRAORDINARY ITEM—DISCONTINUED OPERATIONS

In December of 1984 the Jaite Mill was sold to the National Park Service and at that time all paper mill operations ceased. The Jaite Mill Division had been a part of the corporation for seventeen years. The loss of $46,246 reflects the operations loss for approximately one and one half

months of this current fiscal year plus expenses connected with closing the operation.

Subject to the availability of funds, the National Park Service is supposed to acquire every piece of land designated for Cuyahoga. At the date of trial of this case in June 1989, however, there were numerous parcels of land within Cuyahoga that still had not been acquired by the National Park Service.

## ULTIMATE FINDINGS OF FACT

No Government representatives from Congress, the Department of the Interior, or the National Park Service threatened to condemn petitioner's property. Robideau, petitioner's president, did not believe that the Government would condemn the property. Blanton, a National Park Service acquisition officer, did not believe that condemnation was likely if petitioner refused to sell the property to the Government. Accordingly, the sale of the Jaite Mill and Cleveland box plants and surrounding property in December 1984 was voluntary and was not made under the threat or imminence of condemnation.

## OPINION

The general rule is that the entire amount of gain from the sale or other disposition of property is taxed in the year of sale. Sec. 451(a). This gain is computed as the excess of the amount realized over the adjusted basis of the property. Sec. 1001(a).

In certain circumstances, however, section 453 provides for the reporting of income on the installment basis. The purpose of section 453 is to provide relief for the taxpayer by matching the payment of tax to the actual receipt of the sales price, thus eliminating the hardship resulting when tax must be paid on sums not yet received by the taxpayer. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948).

In the statutory notice of deficiency, respondent determined "that the sale of the Jaite Mill and Cleveland Box Division to [the Trusts] * * * was a sham, without economic reality and not a bona fide transaction." Respondent also

determined that the receipt of the sales proceeds by the partnership from the Federal Government "resulted in a second disposition by a related party under the provisions of Section 453." Petitioner contends, however, that section 453(e)(1), modifying the installment method in the case of a second disposition by a related party, does not apply because of the exceptions provided by sections 453(e)(6) and (7).

Section 453(a) provides the general rule that "income from an installment sale shall be taken into account for purposes of this title under the installment method." Section 453(e), however, provides a special rule in the cases of second dispositions of the property by related persons as follows:

SEC. 453(e). SECOND DISPOSITIONS BY RELATED PERSONS.—
  (1) IN GENERAL.—If—
    (A) Any person disposes of property to a related person (hereinafter in this subsection referred to as the "first disposition"), and
    (B) before the person making the first disposition receives all payments with respect to such disposition, the related person disposes of the property (hereinafter in this subsection referred to as the "second disposition"),

then, for purposes of this section, the amount realized with respect to such second disposition shall be treated as received at the time of the second disposition by the person making the first disposition.

Sections 453(e)(6) and (7) provide exceptions to the rule regarding a second disposition by a related party as follows:

(6) EXCEPTION FOR CERTAIN DISPOSITIONS.—For purposes of this subsection—

*        *        *        *        *        *        *

(B) INVOLUNTARY CONVERSIONS NOT TREATED AS SECOND DISPOSITIONS.—A compulsory or involuntary conversion (within the meaning of section 1033) and any transfer thereafter shall not be treated as a second disposition if the first disposition occurred before the threat or imminence of the conversion.

*        *        *        *        *        *        *

(7) EXCEPTION WHERE TAX AVOIDANCE NOT A PRINCIPAL PURPOSE.—This subsection shall not apply to a second disposition (and any transfer thereafter) if it is established to the satisfaction of the Secretary that neither the first disposition nor the second disposition had as one of its principal purposes the avoidance of Federal income tax.

## Involuntary Conversion

Petitioner argues that the sale of the property by the partnership to the Federal Government in December 1984 occurred under threat or imminence of condemnation as described in section 1033. The parties agree that petitioner had knowledge since 1974 that the act establishing Cuyahoga would allow the Federal Government to acquire its property. Respondent contends, however, that the sale of the property to the Government was voluntary and was not made imminent to condemnation nor under threat of condemnation.

This Court has been liberal in defining the term "threat of condemnation" as it is used in section 1033. Generally, we have been willing to find a threat if the taxpayer might reasonably believe from representations of Government agents and from surrounding circumstances that condemnation was likely to take place if he did not sell his property. *Rainier Cos. v. Commissioner*, 61 T.C. 68, 76 (1973), revd. on another issue by unpublished order 538 F.2d 338 (9th Cir. 1975); *Warner v. Commissioner*, 56 T.C. 1126 (1971), affd. without published opinion 478 F.2d 1406 (7th Cir. 1973); *S. & B. Realty Co. v. Commissioner*, 54 T.C. 863 (1970); *Maixner v. Commissioner*, 33 T.C. 191 (1959). On the other hand, we have been unwilling to find a threat where it appeared that the chance of condemnation was remote. *Rainier Cos. v. Commissioner*, 61 T.C. at 76; *Warner v. Commissioner*, 56 T.C. at 1136.

Petitioner contends that the power to condemn was held by the Federal Government and by the Department of the Interior as a result of the act. If mere knowledge that a governmental entity possessed the power to condemn an owner's property was sufficient evidence of a threat of condemnation, then few sales of land to the public would fail to qualify as involuntary conversions. We decline to construe the threat of condemnation so liberally. *Rainier Cos. v. Commissioner*, 61 T.C. at 75-76.

Petitioner contends that the threat or imminence of condemnation arose in November 1984 when the Federal Government obtained an appraisal of the property and sufficient funds were appropriated. Although petitioner concedes that it and the partnership "did everything in

their power to expedite the acquisition process," petitioner argues that the willingness to sell the property to the Government "does not negate the fact that the sale * * * was an involuntary disposition that occurred after the threat or imminence of condemnation existed."

Respondent contends that the sale of the property to the Government was not made imminent to condemnation. "Imminent" denotes something that is ready to happen, near at hand, or impending. See *Carson Estate Co. v. Commissioner*, T.C. Memo. 1963-90; Black's Law Dictionary (5th ed. 1979). As respondent correctly points out, the instant property was never condemned nor were condemnation proceedings begun; consequently, the property was not sold under the imminence of condemnation.

Respondent also argues that there was no threat that condemnation would occur if a voluntary sale of the property was not made. In order to constitute a threat of condemnation, there must be (1) a declaration of threat to condemn made by Government representatives, and (2) evidence that the threat would be carried out if a voluntary sale was not made. *Rainier Cos. v. Commissioner*, 61 T.C. at 76; *Maixner v. Commissioner*, 33 T.C. at 195. The existence of a threat is judged from the seller's point of view taking into consideration all facts known at the time of the sale. *Rainier Cos. v. Commissioner, supra.*

No Government representatives, whether from the National Park Service, the Department of the Interior, or Congress, ever threatened to condemn the property. The act itself does not mention condemnation. Moreover, it is not clear that condemnation of the property would have been authorized by Congress. Petitioner attempted to force the Government into immediate acquisition of the property by threatening to remove timber and topsoil from the property. Congress, however, denied the National Park Service the authority to file the requested declaration of taking.

In *Rainier Cos. v. Commissioner, supra*, the taxpayer offered to sell its baseball stadium to the city or county. Because neither jurisdiction had funds available to purchase the stadium, the response of public officials was not enthusiastic or encouraging. 61 T.C. at 71. Subsequently, city officials decided to acquire the stadium as an advanced

right-of-way acquisition for a proposed expressway. 61 T.C. 73-74. In holding that the sale was not made under threat or imminence of condemnation, this Court noted:

> Although it is true that both petitioner's president and the various local officials with whom he discussed the stadium sale felt that construction of the expressway would eventually require a significant part of petitioner's stadium property, no one actually stated that the land would be condemned if petitioner did not cooperate. * * * [61 T.C. at 76.]

Similarly, in *Warner v. Commissioner*, 56 T.C. at 1137, this Court found that the taxpayer did not sell his property as a result of the threat or imminence of condemnation. Because the Government representative stated that the property would not be condemned in view of the State's funding problems, we held that the taxpayer in *Warner* "did not have actual notice of, nor could he reasonably infer from the events which occurred, any undesirable, impending consequence, there could be no compelling reason for him to convert his property into cash." 56 T.C. at 1137.

In contrast to the facts in *Rainier* and *Warner* described above, in *S. & B. Realty Co. v. Commissioner, supra,* we found that the taxpayer had actual notice that his property would have been condemned had he done nothing. 54 T.C. at 870. We specifically stated that the crucial factor in our decision was that the taxpayer was compelled by the impending consequence of condemnation to take evasive action.

Similarly, in *Maixner v. Commissioner, supra,* we held that the statements made to the taxpayers by a State representative were taken by them to mean that, if they did not enter into the agreements he proposed, their property would be condemned. We suggested as the controlling standard that "it was reasonable for petitioners to infer that [the State representative] * * * spoke with sufficient authority to make it likely that his threats could and would be carried out if petitioners did not execute the agreements he presented." 33 T.C. at 195.

Here, as in *Rainier* and *Warner*, it appears that the Government was unlikely to condemn the property if a voluntary sale was not arranged. Several factors compel our determination that petitioner's property was not threatened with condemnation nor was condemnation imminent. First, Blanton testified that condemnation was not seriously considered. Second, petitioner's attorney, Genovese, actually solicited a threat of condemnation from the National Park Service, but Congress refused to authorize the necessary declaration of taking. Third, petitioner's president, Robideau, testified that he did not believe that a condemnation would occur. Finally, petitioner made plans to relocate the Cleveland box plant and to close the Jaite Mill, which had been cited repeatedly by the EPA for numerous violations. Petitioner had previously attempted to sell the property to third-party purchasers, but the U.S. Government was the only interested buyer.

Petitioner, citing *Rainier Cos.* and *Warner*, acknowledges that this Court has held that "the inability to acquire the property through lack of funding is a significant bar to a determination that the threat or imminence of condemnation exists." Petitioner, therefore, contends that no threat of condemnation could exist at the time the property was sold to the trusts because the Government's power to condemn was contingent on an appropriation of funds. Petitioner argues, however, that the threat of condemnation arose in November 1984 when the Government had appropriated the funds necessary to acquire the property. These cases do not support petitioner's argument.

In *Rainier Cos. v. Commissioner*, 61 T.C. at 76, lack of funding was noted, but it was not relied upon by the Court in reaching its decision. Similarly, in *Warner v. Commissioner*, 56 T.C. at 1137, the taxpayer was advised by the Government that "its limited funding situation precluded the possibility of condemnation." The Court, therefore, concluded that the taxpayer did not act under any compulsion because the Government directly advised him that condemnation would not occur. In both *Rainier Cos. and Warner*, the Court examined all the facts and circumstances to determine whether the taxpayers reasonably believed that a threat of condemnation existed.

Petitioner relies solely on the availability of Government funds as the determining factor of whether the threat of condemnation exists. Petitioner argues, in essence, that knowledge that a governmental entity has the power and ability, including sufficient funds, to condemn property is sufficient to constitute a threat of condemnation. The appropriation of funds, however, is not the determining factor in ascertaining whether a threat of condemnation exists.

We have found that the December 1984 sale of the improved parcel of land containing the paper mill and box plant was not made pursuant to the threat of condemnation. Alternatively, petitioner contends that the sale of the four small, unimproved parcels in February 1984 was pursuant to a threat of condemnation.

Petitioner argues that the four unimproved parcels of land and the single improved parcel were one economic unit. Thus, petitioner contends that the sale of the single improved parcel should be considered an involuntary conversion because it was incident to the involuntary conversion of the four unimproved parcels.

Petitioner argues, and respondent does not dispute, that a voluntary sale of a portion of a total unit may be treated as an involuntary conversion if it is incident to an involuntary conversion of another part of the total property. The sale of the four unimproved parcels, however, was not an involuntary conversion.

Specifically, petitioner knew that the Government would not condemn the four unimproved parcels. After petitioner's threat to remove the timber and topsoil from the unimproved parcels, the National Park Service sought congressional authority to file a declaration of taking. Congress, however, denied the National Park Service the authority to use condemnation procedures.

Under these circumstances, petitioner could not have reasonably believed that the four unimproved parcels would be taken by condemnation. Accordingly, no threat of condemnation existed in February 1984.

## Tax Avoidance

Section 453(e) applies to the instant transaction because of the second disposition of the property by a related person, the partnership. We have held that the section 453(e)(6) exception for involuntary conversions is not applicable to the second disposition because the sale to the Federal Government was not made under the threat or imminence of condemnation.

Alternatively, petitioner contends that section 453(e)(1) does not apply because of the exception provided by section 453(e)(7). Petitioner has the burden of proving that neither the sale of the property to the trusts nor the subsequent disposition of the property to the Federal Government was part of a plan of tax avoidance.

Congress intended that section 453(e)(7) would apply only in exceptional cases. The Senate Finance Committee specifically noted that "the exception would not apply if the resale terms would permit significant deferral of recognition of gain from the initial sale when proceeds from the resale are being collected sooner." S. Rept. 96-1000 (1980), 1980-2 C.B. 494, 502. Although application of the exception provided by section 453(e)(7) is one of first impression in this Court, the situation in the instant case is analogous to the exception provided by section 306(b)(4) for the disposition or redemption of section 306 "tainted stock."

In *Fireoved v. United States*, 462 F.2d 1281, 1287 (3d Cir. 1972), the taxpayer contended that distribution and disposition of certain stock received by him as a stock dividend and later redeemed by the corporation fell within the exception of section 306(b)(4)(A). The taxpayer argued that the purpose of the stock dividend was business related, that is, to obtain additional capital for the corporation from third parties. The Court of Appeals held that, although one of the principal purposes of the stock dividend was business related and not for the avoidance of income tax, another one of the principal purposes of the stock dividend was for the avoidance of tax. The Court of Appeals noted that the existence of a business purpose was not inconsistent with a conclusion that one of the principal purposes of the stock dividend was the avoidance of Federal income tax. 462 F.2d at 1287.

Similarly, in *Pescosolido v. Commissioner*, 91 T.C. 52, 60 (1988), affd. 883 F.2d 187 (1st Cir. 1989), this Court found that there was evidence of the taxpayer's bona fide charitable intent in the disposition of his stock. Although the taxpayer presented a credible purpose other than income tax avoidance for both the distribution and the disposition of the section 306 stock, we held that the statutory language and purpose required that the evidence clearly negate an income-tax-avoidance plan to satisfy the taxpayer's burden of proof. See also *Bialo v. Commissioner*, 88 T.C. 1132, 1138 (1987).

As we noted in *Pescosolido v. Commissioner*, 91 T.C. at 60, "Here, as in other areas of the law, the ultimate purpose of a transaction must be inferred from the objective facts rather than from the taxpayer's mere denial of tax motivation." Petitioner argues that the principal purpose of the first disposition was to circumvent labor problems by creating a new entity. The evidence, however, shows that petitioner entered into the installment sale contract in an attempt to defer recognizing the gain on the sale of its Jaite Mill and Cleveland box plants and surrounding property.

Petitioner's labor problems could not have been circumvented or cured by a change in ownership. The labor problems were the result of petitioner's plan to close the Jaite Mill plant. Petitioner's employees were uncertain whether the plant would remain open or whether it would close and they would lose their jobs. As a result of these uncertain working conditions, many employees found other jobs; petitioner, therefore, had high employee turnover.

Petitioner sought legal advice from a labor attorney, Lansky. In his memorandum outlining the requirements to avoid a collective bargaining agreement, Lansky concluded that:

the existence of a family relationship between the new and old owners has been considered by the NLRB as an important factor in finding common ownership and in denying the existence of an arm's length transaction on the sale. * * *

* * * * * * *

where this is a mask for avoiding labor law obligations, the NLRB will not treat the transaction as being at "arm's length."

Petitioner failed to take any of the necessary steps outlined in the memorandum to avoid its collective bargaining agreement. Subsequently, petitioner was advised by another labor attorney that it could not avoid or eliminate the union agreement by structuring a sale of its property to another related entity.

Petitioner's president, like the taxpayer in *Pescosolido*, was a sophisticated businessman who received tax advice from his tax attorney on how to defer the realization of income from the sale of petitioner's properties to the National Park Service. The potential tax consequences of the disposition were explained to petitioner's president by counsel. Counsel recommended that petitioner obtain a private letter ruling from the Internal Revenue Service in relation to the disposition, which advice petitioner ignored.

Finally, the May 31, 1984, contract for the sale of petitioner's property to the trusts was not signed until after petitioner and the Government reached an oral agreement for the ultimate sale of the property. Petitioner had received numerous citations from the EPA relating to waste water violations at its Jaite Mill plant. The EPA agreed to allow petitioner to continue to operate the paper mill with the understanding that the National Park Service would deliver an appraisal of petitioner's property by September 1, 1984, and would complete the purchase no later than January 1, 1985. In fact, petitioner transferred formal title to the property to the United States by corporate warranty deed dated January 16, 1985.

As of November 22, 1983, petitioner considered that the four small, unimproved parcels had been sold to the Government and believed that its remaining property would be sold by June 1984. On February 8, 1984, the National Park Service advised petitioner that it had advertised for an appraisal of petitioner's remaining property. On May 31, 1984, however, petitioner entered into a land contract to sell its remaining property to the trusts.

The statutory language and purpose of section 453(e)(7) and petitioner's relationship to the trusts require that the evidence clearly negate a tax-avoidance plan to satisfy petitioner's burden of proof. Petitioner, however, has failed

to present any credible purpose other than income tax avoidance for the transfer of the property to the trusts.

In view of our holding, we need not consider whether the transaction between petitioner and the trusts was a bona fide sale. Due to a concession by respondent relating to a capital loss carryback deduction,

*Decision will be entered under Rule 155.*