*Decisions will be entered under Rule 155.*

JAMES M. SHELTON, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 17901–92.         Filed August 16, 1995.

*Sander W. Shapiro, Michael L. Cook, Ira A. Lipstet,* and *J. Andy Norval,* for petitioner.
*T. Richard Sealy III,* for respondent.

PARR, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax and an addition to tax for 1984 in the amounts of $2,899,796 and $724,949, respectively.

The issue for decision is whether petitioner received additional income on an installment obligation as a result of a liquidation of the corporate stock that was the subject of the installment sale and that was also the collateral for the installment sale. If we determine that petitioner had additional income, then we must decide whether petitioner is liable for the addition to tax for substantial understatement of Federal income tax pursuant to section 6661(a).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in El Paso, Texas.

On June 30, 1980, petitioner owned all of the stock of JMS Liquidating Corp. (JMS), a Texas corporation formerly known as Cashway Building Materials, Inc. On that date, JMS adopted a plan of liquidation under section 337. JMS owned 97 percent of the stock of El Paso Sand Products, Inc. (EPSP), a Texas corporation. EPSP owned the stock of El Paso Sand Products Construction Division, Inc., Vowell Construction Co., and El Paso Rock Quarries, Inc., which in turn owned the stock of Valley Concrete Co., Inc. All the entities were Texas corporations.

On June 22, 1981, JMS sold all of its EPSP stock to Wallington Corp. (Wallington), for $17,460,000, to be paid by a 20-year promissory note (the note).[2] Petitioner's adult son

---

[1] All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2] The terms of the note provided for:

Annual installments of $1,522,242.50, each including interest, beginning June 22, 1982, and continuing with a like installment on or before the same day of each year thereafter, except that all remaining balance of principal and interest shall be due June 22, 2001.

All deferred payments shall bear interest at the rate of 6 percent per annum until maturity, and thereafter at the highest legal contract rate. A late charge of 5 percent of each annual installment may be charged on any installment more than 20 days past due, and 7½ percent of any installment more than 30 days past due.

and adult daughter (Carroll Shelton Maxon[3]) had acquired the stock of Wallington in 1976. At the time of the sale, Wallington's stock was owned by petitioner's son, Carroll Shelton Maxon, Allyson Jones Trust #1 (AJT) (a trust established for the benefit of Allyson Jones, a minor daughter of Carroll Shelton Maxon), and Caroline Jones Trust #1 (CJT) (a trust established for the benefit of Caroline Jones, a minor daughter of Carroll Shelton Maxon). Initially, Luther Jones was trustee of the trusts.[4]

Pursuant to the agreement of purchase and security agreement, the note was secured by the stock of EPSP. The security agreement provided that the security interest would also apply to any proceeds of the collateral.

Pursuant to the liquidation of JMS on June 25, 1981, the note was distributed to petitioner. In 1982 and 1983, Wallington paid to petitioner the installments due on the note. On March 31, 1983, Wallington and its subsidiaries (including EPSP) adopted a plan of liquidation pursuant to section 337. On the same day, EPSP sold most of its assets, including all of its operating assets, to Material Service Corp. (MSC), a wholly owned subsidiary of General Dynamics, Inc., for $35 million in cash and assumption of $4 million of liabilities.

On or about March 15, 1984, EPSP and Wallington liquidated and distributed all of their remaining assets to Wallington's shareholders in exchange for their outstanding stock. In addition, the shareholders assumed substantially all the liabilities of the corporations, including the indebtedness on the note. At the time of the distribution, the assets distributed consisted of cash in the amount of $33,382,614, plus stocks, bonds, real estate, joint venture interests, and miscellaneous personal property. At the time of the distribution, the shareholders of Wallington were Carroll Shelton Maxon, CJT, and AJT.

Petitioner reported the gain realized on the sale of EPSP on the installment method. The gain realized on the sale was $16,442,074. On his 1984 Federal income tax return, peti-

---

[3] Ms. Maxon, formerly Carroll Shelton, was married to Luther Jones from Nov. 7, 1970, until May 21, 1984. She since has remarried and is now known as Carroll Shelton Maxon.

[4] From the date of the sale through June 14, 1984, Luther Jones was the trustee of AJT and CJT. He is the father of Allyson and Caroline Jones. C. Michael Maddox, a C.P.A., prepared the tax returns for and provided accounting and tax advice to petitioner, his family members, and the entities controlled by them, and he succeeded Luther Jones as trustee of the trusts.

tioner reported installment gain from the sale in the amount of $502,216, which was the amount of gain attributable to $533,308 in principal payments made on the note multiplied by the gross profit ratio of 94.17 percent. Respondent determined that petitioner should have recognized the remaining amount of the installment gain in 1984 upon the liquidation of Wallington and EPSP.

OPINION

Respondent advances several theories why petitioner should have recognized income on the installment obligation as a result of the liquidation transaction that occurred during tax year 1984. Should we sustain respondent on any of her arguments, the deficiency will be upheld. Respondent's arguments are as follows: (1) The sale of assets followed by a liquidation of the underlying stock was a second disposition of the property by a related person within the meaning of section 453(e)(1); (2) petitioner constructively received the balance due under the installment obligation when stock, the subject of the installment obligation and held as collateral, was liquidated for cash; (3) petitioner received a payment on the installment obligation within the meaning of section 15A.453–1(b)(3)(i), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb. 4, 1981) (when the cash proceeds from the liquidation became the collateral for the installment obligation); and (4) a deemed disposition occurred because the terms of the installment obligation were materially changed as a result of the liquidation.[5]

Generally, gain from the sale of property is taxed to the seller in the year of the sale. Secs. 61(a)(3), 1001(c). However, section 453 provides an exception to this rule, allowing income from an installment sale to be reported in the year payment is received. Secs. 453(a), 1001(d); see also *Estate of Silverman v. Commissioner,* 98 T.C. 54, 62 (1992); *Pozzi v. Commissioner,* 49 T.C. 119, 127 (1967). The purpose of the installment method of reporting income is to alleviate the hardship on taxpayers who would otherwise recognize the entire gain on a sale, but who did not receive sufficient cash

---

[5] This fourth argument was first raised in respondent's amendment to answer, which was permitted pursuant to respondent's motion for leave to amend her answer pursuant to Rules 41(a) and 25(c). Since this alternative argument constitutes new matter, the burden of proof is on respondent. Rule 142(a).

to pay the tax. Under the installment method, the tax due is matched with the payments to be received, rather than forcing the taxpayer to advance the tax payments prior to actually receiving the sale proceeds. *Commissioner v. South Tex. Lumber Co.,* 333 U.S. 496, 503 (1948); *Oden v. Commissioner,* 56 T.C. 569, 573 (1971); *Pozzi v. Commissioner, supra* at 126.

*Second Disposition of Property by a Related Person*

Respondent argues that the liquidation of EPSP resulted in a second disposition of the property by a party related to petitioner within the meaning of section 453(e)(1); accordingly, petitioner had to recognize income with respect to the original installment obligation. Petitioner contends that a second disposition by a related person did not occur because (1) the liquidation of EPSP is not a disposition for purposes of section 453(e)(1); (2) more than 2 years had passed between the original installment sale and the liquidation of EPSP; and (3) the 2-year period was not tolled due to a substantially diminished risk of loss within the meaning of section 453(e)(2)(B).

Section 453(e) generally limits the use of the installment sale method in the case of second dispositions by related parties. Section 453(e) provides in pertinent part as follows:

SEC. 453(e). SECOND DISPOSITIONS BY RELATED PERSONS.—
   (1) IN GENERAL.—If—
     (A) Any person disposes of property to a related person (hereinafter in this subsection referred to as the "first disposition"), and
     (B) before the person making the first disposition receives all payments with respect to such disposition, the related person disposes of the property (hereinafter in this subsection referred to as the "second disposition"),
then, for purposes of this section, the amount realized with respect to such second disposition shall be treated as received at the time of the second disposition by the person making the first disposition.

The meaning of the term "related person" is determined by reference to sections 453(f) and 318(a). Section 453(f) provides that for purposes of section 453, the term "related person" means a person whose stock would be attributed under section 318(a) (other than paragraph (4) thereof) to the person first disposing of the property. Sec. 453(f)(1). Section 318(a) provides that an individual shall be attributed the

stock owned by his or her children and grandchildren. Sec. 318(a)(1)(A)(ii). Furthermore, stock owned by a trust shall be considered as owned by its beneficiaries. Sec. 318(a)(2)(B). Moreover, if 50 percent or more in value of the stock in a corporation is owned, directly or indirectly (i.e., through attribution) by a person, then such person is attributed any stock owned by that corporation. Sec. 318(a)(2)(C). Generally, the attribution rules under section 318 can be applied to reattribute the stock. Sec. 318(a)(5)(A).

Here the property disposed of was stock in EPSP, and the shareholders are deemed to have made the disposition. See sec. 453(h)(1)(D). The stock was purchased by Wallington, whose shareholders were petitioner's daughter and two trusts for the benefit of petitioner's grandchildren. Under the attribution rules cited above, Wallington is a "related person" vis-a-vis petitioner, and he makes no argument to the contrary.

The first argument advanced by petitioner is that a second disposition did not occur. Petitioner asserts that a liquidation of corporate stock (i.e., liquidation of EPSP) is not an event which triggers a disposition for purposes of section 453(e)(1). Respondent argues that pursuant to section 331 the amounts received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as full payment in exchange for the stock. Accordingly, Wallington disposed of its stock in EPSP pursuant to the liquidation. Petitioner cited as support for his argument two private letter rulings. Although respondent did distinguish the rulings from the instant case, she appropriately pointed out that the private letter rulings are not precedent. See sec. 6110(j)(3); *CSI Hydrostatic Testers, Inc. v. Commissioner,* 103 T.C. 398, 409 n.10 (1994); *Fowler v. Commissioner,* 98 T.C. 503, 506 n.5 (1992). Accordingly, we shall not rely on those rulings.

Under section 331, amounts distributed in complete liquidation of a corporation shall be treated as full payment in exchange for the stock. Sec. 331(a). Such an exchange generally is treated as a disposition. *Kast v. Commissioner,* 78 T.C. 1154, 1163 (1982), affd. sub nom. *Schumann v. Commissioner,* 857 F.2d 808 (D.C. Cir. 1988); *Klein v. Commissioner,* 75 T.C. 298, 302 (1980); *Chester N. Weaver Co. v. Commissioner,* 35 B.T.A. 514, 519 (1937), revd. on other grounds 97 F.2d 31 (9th Cir. 1938), revd. 305 U.S. 293 (1938). The

amount of gain or loss realized is determined by comparing the cash and the net fair market value of property received by the shareholder to the shareholder's basis in the stock. *Ford v. United States,* 160 Ct. Cl. 417, 424, 311 F.2d 951 (1963); *Kast v. Commissioner, supra.* Under section 334(a), the basis of property received in a complete liquidation in which gain or loss is recognized by the shareholder is the fair market value of such property on the date of distribution (i.e., the basis is considered stepped up to fair market value). Sec. 334(a).

Section 453(e) does not define the term "disposition", nor is that term defined in section 453(f), which contains definitions for purposes of section 453. However, section 453(e)(6) excepts certain dispositions from the rule of section 453(e)(1), and section 453(e)(4) applies the rule to a transfer that is a disposition but is not a sale or exchange. See, e.g., S. Rept. 96–1000, at 14, 16 (1980), 1980–2 C.B. 494, 501, 502.

The Secretary has been granted specific authority to promulgate regulations to carry out the purposes of section 453; however, to date regulations dealing with section 453(e) have not been issued. Furthermore, we have found no cases in this Court or any other court dealing with this issue.[6]

Section 453(e) was enacted in the Installment Sales Revision Act of 1980 (the Act), Pub. L. 96–471, 94 Stat. 2247. The Senate report accompanying the Act explains that section 453(e) was enacted as a response to the use by taxpayers of installment sales to a related intermediary in order to defer recognition of gain while at the same time effectively realizing appreciation on the property by means of a resale to a party outside the "related group" for an immediate payment. S. Rept. 96–1000, *supra* at 12–17, 1980–2 C.B. at 500–502. The perceived abuse exists because the original seller defers the recognition of gain through the use of the installment method; however, the resale by the related party results in realization of the appreciation without recognition of the attributable taxable gain. This is because the related party obtains a cost basis that includes the amount of the installment obligation. See *Crane v. Commissioner,* 331 U.S. 1 (1947). Therefore, the related party will recognize only the

---

[6] We construed sec. 453(e) in *Tecumseh Corrugated Box Co. v. Commissioner,* 94 T.C. 360 (1990), affd. 932 F.2d 526 (6th Cir. 1991).

fluctuation in value occurring after the installment purchase. S. Rept. 96–1000, *supra* at 12–17, 1980–2 C.B. at 500–502.

Moreover, the seller may achieve some estate planning benefits since the value of the installment obligation generally will be frozen for estate tax purposes. S. Rept. 96–1000, *supra* at 13, 1980–2 C.B. at 500. Any subsequent appreciation in value of the property sold would not affect the seller's gross estate since the value of the property is no longer included in the seller's gross estate. *Id.*

The Senate report explains the provision as "an acceleration of recognition of the installment gain from the first sale * * * to the extent additional cash and other property *flows into the related group* as a result of a second disposition of the property." *Id.* at 15, 1980–2 C.B. at 501 (emphasis added).

The Senate report discussed prior case law. In the leading case, *Rushing v. Commissioner,* 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969), the two taxpayers, each owning half the stock in two corporations, voted to sell the assets of the corporations for cash and installment notes pursuant to a liquidation under section 337. *Id.* at 593–594. After substantially all the assets of the corporations were sold, the taxpayers created irrevocable trusts for the benefit of their children with a bank as trustee and sold their stock in the corporations to the trusts for a small amount of cash and 20-year installment obligations. *Id.* at 594–595. The taxpayers elected to report the gain on the stock sale under the installment method. *Rushing v. Commissioner,* 52 T.C. at 892. Within the 12-month period specified in section 337(a), the corporations were liquidated and distributed their assets to the trusts. *Id.* at 892–893.

Installment sale treatment was upheld for the taxpayers' sale of stock to the trusts, because the court found that the trustee was independent of the taxpayers; that the taxpayers retained no direct or indirect control over the proceeds from the liquidations; and the taxpayers would obtain an economic benefit from those proceeds only as and when they were paid over to the taxpayers in installments, as consideration for their sale of stock to the trusts. *Rushing v. Commissioner,* 441 F.2d at 598. Because the taxpayers were permitted to use the installment method, their recognition of the gain inherent in the stock was deferred, at the same time that the

trusts realized the economic benefit of that gain, apparently at no tax cost to the trusts.[7]

In addition, the Senate report accompanying the Act discusses *Pityo v. Commissioner,* 70 T.C. 225 (1978), wherein the taxpayer made an installment sale of marketable securities to various trusts established for the benefit of members of his family. *Id.* at 229. In accordance with the taxpayers' prearranged plans, the trustee promptly sold the securities for cash to an unrelated third party and invested the proceeds in mutual funds. *Id.* at 227–230. The taxpayer was permitted to report the payments on the note on the installment method, because, as was the case in *Rushing,* the trustee was independent and the taxpayer could not benefit from the sale until the trust made payments on its obligation. *Id.* at 233; accord *Goodman v. Commissioner,* 74 T.C. 684 (1980); *Roberts v. Commissioner,* 71 T.C. 311 (1978), affd. 643 F.2d 654 (9th Cir. 1981).[8]

The legislative history indicates that Congress believed "that the application of the judicial decisions, involving corporate liquidations, to intra-family transfers of appreciated property has led to unwarranted tax avoidance by allowing the realization of appreciation within a related group without the current payment of income tax." S. Rept. 96–1000, *supra* at 14, 1980–2 C.B. at 501. Cases where installment treatment was allowed for stock that was sold to a related buyer and then liquidated, as in *Rushing,* plainly were among those whose result section 453(e) was designed to reverse. Treating a liquidation of the stock by a related party as a disposition, therefore, comports with the language and legislative intent of section 453(e).

In the instant case, cash and other property flowed into the related group when the assets of EPSP were sold and the stock of EPSP was liquidated. This is a situation at which section 453(e) is aimed, to prevent the related group from cash-

---

[7] The taxpayers' sale of stock to the trusts was structured so that the purchase price equaled the anticipated proceeds to be received by the trusts from liquidating the stock. Thus it appears that the trusts acquired a "stepped-up" cost basis in the stock equal to the liquidation proceeds and recognized no gain upon the liquidation. See *Rushing v. Commissioner,* 441 F.2d 593, 595 (5th Cir. 1971), affg. 52 T.C. 888 (1969).

[8] The Senate committee report, S. Rept. 96–1000, at 12–17 (1980), 1980–2 C.B. 494, 500–502, further noted that this problem had been an issue in a variety of related-party contexts, including situations in which the intermediary was a family member, see, e.g., *Nye v. United States,* 407 F. Supp. 1345 (M.D.N.C. 1975); *Wrenn v. Commissioner,* 67 T.C. 576 (1976); or a corporation, see, e.g., *Griffiths v. Helvering,* 308 U.S. 355 (1939).

ing out the appreciation in the stock on a current basis while deferring recognition of the gain. Accordingly, in this case, it seems clear that the liquidation had the effect of a second disposition within the meaning of section 453(e).

We must now consider petitioner's argument that section 453(e) did not apply because the liquidation did not occur within 2 years of the first disposition.

The general rule of section 453(e) is qualified by an exception that applies in certain circumstances when the second disposition takes place more than 2 years after the first disposition. That exception, which is contained in section 453(e)(2), states:

(2) 2-YEAR CUTOFF FOR PROPERTY OTHER THAN MARKETABLE SECURITIES.—
     (A) IN GENERAL.—Except in the case of marketable securities, paragraph (1) shall apply only if the date of the second disposition is not more than 2 years after the date of the first disposition.
     (B) SUBSTANTIAL DIMINISHING OF RISK OF OWNERSHIP.—The running of the 2-year period set forth in subparagraph (A) shall be suspended with respect to any property for any period during which the related person's risk of loss with respect to the property is substantially diminished by—
          (i) the holding of a put with respect to such property (or similar property),
          (ii) the holding by another person of a right to acquire the property, or
          (iii) a short sale *or any other transaction.* [Emphasis added.]

Petitioner asserts that even if the liquidation of the stock of EPSP were held to be a second disposition by a related party, the installment sale gain would not be accelerated under section 453(e), because the liquidation occurred on March 15, 1984, which was more than 2 years after the first disposition that occurred on June 22, 1981. Respondent argues that the sale of assets by EPSP on March 31, 1983 (i.e., within 2 years after the first disposition), caused the 2-year period to be suspended. Respondent asserts that the sale qualifies as an "other transaction" which substantially *diminished the risk of loss* with respect to the EPSP stock. Alternatively, respondent argues that the adoption of the plan of liquidation by EPSP and its shareholder on March 31, 1983, was in effect a "put" which gave the shareholder the right to surrender the EPSP stock in exchange for the assets

of the corporation, which at that time consisted primarily of the cash proceeds from the sale with MSC.

In order to determine whether the 2-year period was tolled, we must determine whether the related purchaser's (i.e., Wallington) risk of loss with respect to the property (i.e., the EPSP stock) was substantially diminished at any time during the 2-year period. Sec. 453(e)(2)(B); S. Rept. 96–1000, *supra* at 15, 1980–2 C.B. at 502.

On the date the assets of EPSP were sold to MSC, Wallington's risk of ownership of the EPSP stock was substantially diminished. Pursuant to the sale, most of EPSP's assets, including all its operating assets, were exchanged for $35 million in cash and the purchaser's assumption of liabilities. Thus any appreciation or depreciation in those assets was realized at that time. Furthermore, on the same day, Wallington adopted a plan to liquidate EPSP. During the ensuing months, until the liquidation, it appears that EPSP conducted no business and was in effect just a holding company or repository for the $35 million in cash. Any risk of loss associated with Wallington's ownership of the stock of EPSP during that period was essentially nil. Accordingly, we believe the sale of the operating assets of EPSP in combination with the adoption of the plan of liquidation comprised a transaction within the meaning of section 453(e)(2)(B), which substantially diminished Wallington's risk of loss with respect to the EPSP stock. Therefore, the 2-year period was tolled on March 31, 1983.

We hold that a "second disposition" of the EPSP stock by Wallington, within the meaning of section 453(e), occurred upon the liquidation of EPSP on March 15, 1984; that the 2-year period had been tolled, as provided in section 453(e)(2), beginning March 31, 1983; and that, accordingly, the second disposition occurred before the expiration of the 2-year period, which started on June 22, 1981, the date of the original installment sale. Therefore, the amount realized with respect to the second disposition shall be treated as received by petitioner at the time of the second disposition.

Since we have determined that petitioner must recognize installment sale income as a result of the related-party disposition, we need not consider respondent's alternative arguments.

*Addition to Tax*

Respondent determined an addition to tax under section 6661. Petitioner asserts that he acted reasonably and in good faith in reporting the tax treatment of the transaction and that respondent abused her discretion in not waiving the penalty.

Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Sec. 6661(a); *Pallottini v. Commissioner,* 90 T.C. 498 (1988). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year less the amount of the tax shown on the return. Sec. 6661(b)(2). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1).

Section 6661(c) provides that the Secretary may waive all or any part of the addition to tax on a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Reliance on professional advice may constitute good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6661–6(b), Income Tax Regs. We have held that this Court has the authority to review respondent's failure to grant a waiver pursuant to section 6661(c). The appropriate standard of review is whether respondent has abused her discretion. *Mailman v. Commissioner,* 91 T.C. 1079, 1083 (1988).

Petitioner asserts and respondent has conceded that petitioner had relied on the advice of his tax adviser-C.P.A., Mr. Maddox. Respondent asserted four different theories in support of her position in this case. The theory which we sustained involved an issue of first impression. Based on all the facts and circumstances, we hold that petitioner reasonably relied on the advice of Mr. Maddox in taking his return position and acted in good faith in taking that position. We conclude that respondent abused her discretion in refusing to waive the addition to tax under section 6661. See *Cloud v. Commissioner,* 97 T.C. 613 (1991). Accordingly, petitioner is not liable for the addition to tax.

To reflect the foregoing,

> *Decision will be entered for respondent as to the deficiency in tax and for petitioner as to the addition to tax.*