EDWARD WARNER AND ELIZABETH WARNER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1725–69.   Filed August 23, 1971.

*John L. Carey* and *Stephen A. Seall,* for the petitioners.
*James J. McGrath,* for the respondent.

IRWIN, *Judge:* The Commissioner determined a deficiency in petitioners' income tax for the taxable year 1965 in the amount of $80,780.33. We must first decide whether petitioners sold certain real property under threat or imminence of condemnation so as to satisfy section 1033 of the Internal Revenue Code of 1954.[1] In the event we decide this issue in the negative, we must then determine whether respondent's allocation of the sales proceeds was correct.

FINDING OF FACT

Edward Warner (hereinafter petitioner) and his wife, Elizabeth Warner, who resided in Tremont, Ind., at the time they filed the petition herein, filed [2] a joint Federal income tax return for the calendar year 1965 with the district director of internal revenue, Indianapolis, Ind.

As of the date of the trial herein, petitioner had been engaged in the real estate business for approximately 25 years. While he was licensed to sell real estate in Indiana, petitioner was at no time licensed to sell in Michigan.

Petitioners acquired the following tracts of land in Van Buren County, Mich., on the dates indicated:

| Description of real estate | Date of acquisition |
| --- | --- |
| Potts (150 acres) | April 1960 |
| Hedlund (4 acres) | November 1961 |
| Ward (7 acres) | September 1961 |

What originally drew petitioner's attention to the Potts land was a large billboard for-sale sign located thereon. Petitioner did not re-

---

[1] All statutory references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

[2] Petitioners applied for an extension of time until June 15, 1966, to file their 1965 income tax return. The reason for the request was stated in the application as follows: "Complications arising from an involuntary conversion of property make it necessary to request this extension. It is possible no additional tax is due."

move the sign after purchasing the property. The previous owner, Potts, whose name appeared on the sign and who was still receiving inquiries concerning the property, requested petitioner to remove it. Instead, petitioner crossed out the former owner's name and inserted his own name thereon.

Petitioner placed an advertisement offering to sell some of his land in Van Buren County in the Wall Street Journal sometime during the period 1962 to 1964.

In addition to the aforementioned tracts of land, petitioner had been interested prior to and during 1964 in acquiring the following properties which were located in the same vicinity: Chase (5 acres), Eldridge (13 acres), and Chase (12 acres).

As early as 1961 and again in 1963, the State of Michigan was considering and investigating the purchase of land near the city of Saugatuck for a State park. In January 1964, the Van Buren County road commission (hereinafter sometimes referred to as the commission) and the State legislature agreed to substitute a park in Van Buren County for the potential park at Saugatuck.

In February 1964, a meeting attended by, among others, various State senators and representatives as well as department and township officials were held in Lansing, Mich. At that meeting, the county road commission agreed to continue its efforts to acquire the Drake property located in Van Buren County on Lake Michigan and situated near the real estate owned by petitioner. Furthermore, it indicated that it would be able to fund a purchase from the Drake estate in terms of $125,000. State representatives agreed that up to $100,000 in State funds would be made available to augment the Drake tract, which was regarded as the hard-core portion of the proposed park area.

On July 1, 1964, the Michigan legislature provided an appropriation of only $10,000 for the purpose of taking options for the purchase of additional property for the proposed State park.

The proposed park as originally conceived would have extended from just north of the Drake property down through the Ward, Masterson, Peters, Chase, Hedlund, and Eldridge properties to a point just south of the Potts land. However, the park boundaries were changed thereby reducing the size of the park when the State discovered sometime in January 1965 that Consumers Power Company (hereinafter CPC), a public utility under the laws of Michigan, was also interested in acquiring some of the same land. Not having the necessary funds to finance acquisition, the State of Michigan could not compete effectively with CPC. However, Van Buren County did commence negotiations for the purchase of the Drake property sometime

in February 1964. At no time during 1964 did anyone from the Department of Conservation take soil samples from the Drake property. The purchase was consummated sometime in January 1965 at a price below the fair market value thereof. The owners of the Drake property were wealthy individuals who were sincerely interested in park objectives and who desired to sell the Drake property to the county only if they could be assured that it would eventually became State owned as part of the park system.

As of the date of the trial, T. R. Tucker (hereinafter Tucker), who was the senior park land acquisition man during 1964, was the lands acquisition supervisor of the Michigan Department of Natural Resources, formerly called the Department of Conservation. He had been employed by the State in various capacities all dealing with land acquisition for approximately 25 years.

After observing the for-sale sign located on the Potts tract owned by petitioner, Tucker contacted him in early February 1964 in his capacity as agent for the State of Michigan. Tucker identified himself as such to petitioner and explained to him Michigan's interest in the planned park, its funding situation, and its interest in determining on an exploratory basis which properties were for sale in the area.

During the period February to November 1964, Tucker met with petitioner several times and also talked with him several times on the telephone in connection with the sale of his property. At one of their meetings, petitioner showed Tucker the advertisement he had placed in the Wall Street Journal to sell his land in Van Buren County for approximately $600,000. Tucker believed that petitioner overestimated the value of his land.

Tucker offered to purchase petitioner's Ward property, which was the State's prime interest, for $75,000 or $80,000. If funds were available, the State was also interested in the Potts and Hedlund properties as well as the two Chase tracts and the Eldridge land.

Petitioner, who owned some property in Indiana involved in condemnation, brought up the topic of condemnation during the course of his negotiations with Tucker. Tucker informed petitioner of the State's extreme reluctance to exercise its power of condemnation and of its limited history of condemnation. Tucker also indicated to petitioner on several occasions that there was a limitation of the funds available for the proposed park. Moreover, petitioner was informed by Tucker that the funding difficulties and limitations on the State's ability to proceed definitely precluded any possibility of condemnation.

On April 16, 1964, the following article appeared in the News-Palladium, a newspaper published in Benton Harbor, Mich.:

## NEW STATE PARK FOR AREA!

\* \* \*

### 613 Acres Of Lake Dunes In Van Buren
### Winter And Summer Use Is Planned
### Complete Project To Take 10 Years, Cost $3,500,000

\* \* \* \* \* \* \*

SOUTH HAVEN—Plans to develop a 613-acre state park in uninhabited Lake Michigan sand dune country five miles south of here were unveiled today in a joint announcement by the Michigan Department of Conservation, the Van Buren County Board of Supervisors and the Van Buren County Road Commission.

The year-round recreation park is expected to be completed in about 10 years with an estimated investment of state and county funds totaling $3,500,000.

\* \* \* \* \* \* \*

Agreements to purchase portions of the park site have been adopted by the conservation department and the county board of supervisors. Cost of acquiring the desired property fronting on Lake Michigan has been estimated at $500,000, according to Ivan Stein of rural South Haven, Van Buren road commission chairman.

### DELAYED ANNOUNCEMENT

Van Buren supervisors voted to purchase 197 acres of property comprising the northern part of the proposed park during the Tuesday board meeting. Announcement was held up until county officials completed negotiations yesterday to purchase the 197 acres from the estate of the late Harry L. Drake of Chicago.

The joint announcement said financial plans call for eventual purchase of the county's share by the state. Then the Department of Conservation would take over administration of the area as a state park.

Tentative plans by the state include spending about three million dollars for development of recreation area over a ten-year period.

\* \* \* \* \* \* \*

The 197-acre Drake estate plus another 22 acres considered for purchase by the county and more than 80 acres acquired by Van Buren county in the past 24 years through tax reversion sales, will be joined on the south by about 300 acres to be acquired by the state.

\* \* \* \* \* \* \*

Arthur Elmer, head of the conservation department's park division, said negotiations now are under way on several tracts of land. He said a request that money be appropriated to secure the options will go to the Legislature next year.

\* \* \* \* \* \* \*

### PARK STUDY MADE

In 1962, the board directed the county road commission to assure statutory duties as county park trustees for the purpose of studying feasibility of a major park development. [sic]

\* \* \* \* \* \* \*

The road commission continued its study through the summer of 1963 with cooperation of board of supervisors and officials of South Haven city and township and Covert township. Last November, preliminary negotiations were begun with major property owners.

REIMBURSE COUNTY

Realizing the ultimate potential of the county recreation area, road commission officials conferred with Root and Hilbert and eventually the state-county venture was proposed. Elmer and other conservation department officials inspected the site and further meetings led to the development of the present financing plan.

As additional finances become available to the conservation department, the county will be reimbursed for its expenditures and title to the land then will be transferred to the state.

An aerial photograph and map of the land involved in the proposed park appeared in the newspaper along with the article. The Ward, Hedlund, Potts, Eldridge, and two Chase tracts all appeared within the proposed park boundaries. Petitioner saw this newspaper article 1 or 2 days after it appeared.

Unknown to petitioners, their land in Van Buren county was also within the boundaries of a proposed generating site for CPC. Although two or three sites in southwestern Michigan were being considered by CPC, in mid-autumn 1964, the Van Buren County site was selected. In late November 1964, the decision to acquire land in that county was made at CPC's annual budget review.

CPC desired to keep its interest in acquiring property in Van Buren County a secret because it is easier for a large industry interested in assembling a large site of property to acquire the land and it is also usually cheaper if the identity of a prospective purchaser is unknown.

In order to maintain secrecy, CPC used an agent, Gerald Derks (hereinafter Derks), who was to acquire all property for it under a contract expressly requiring him to keep CPC's identity confidential. All options for the purchase of property were acquired in Derks' name until June 1965, at which time a news release revealed CPC's acquisition of the land.

Derks was selected to represent CPC because he was well known, experienced, and highly regarded as a dependable realtor in southwestern Michigan. He had been in the real estate business for about 22 years.

Derks agreed not to divulge CPC's interest in purchasing land in Van Buren County and he also was forbidden from revealing that he represented someone who had the power to condemn.

According to the agreement with CPC, Derks was entitled to a per diem allowance of $150 plus expenses. Moreover, he was to receive a lump sum of $100 for each parcel of real estate closed. However, the $100 per parcel fee was to be paid in lieu of the per diem expense on the closing date and was also to be used to cover the costs of closing plus acquiring mortgage releases and similar types of title work.

On December 10, 1964, Derks acquired an option to purchase the Masterson tract which was situated approximately in the center of the proposed plantsite. The Masterson property was relatively small and was so located as to permit taking soil samples by drilling unobserved from a road nearby. Commencing in mid-December 1964 and continuing for a period of approximately 1 month, soil samples were taken on the Masterson tract. However, it was not until after the public announcement of CPC's interest in property in Van Buren County that surveyors first appeared on its behalf. In fact, the first surveys made under the direction of CPC were made in mid-1965 or early 1966.

Derks first became acquainted with the property petitioner owned in Van Buren County because there was a for-sale sign on the Potts property which was located approximately in the middle of the property which he was supposed to acquire for CPC. Derks initially contacted petitioner during approximately the first week of December 1964. It was also approximately at this same time that Derks became aware of the State of Michigan's interest in the property located in the vicinity of the Drake, Masterson, and Ward tracts.

When Derks first met with petitioner, he did not mention to him that he was representing an undisclosed party. Nor did petitioner tell Derks that he was negotiating with Tucker, the State representative, in connection with the purchase of the Potts and Ward properties. Derks learned of the proposed State park either from petitioner or from Masterson, the owner of the Masterson tract.

During the course of his negotiations with petitioner, Derks may have mentioned to him that Masterson had already agreed to sell his property to Derks.

Derks did not tell petitioner that he was representing someone who had the power to condemn his property nor did Derks in any way threaten petitioner with language such as "this is it" or "we mean business."

Petitioners entered into an agreement with Derks on December 29, 1964, to sell to him the Potts land for $350,000.

On January 5, 1965, petitioners entered into an agreement with Derks to sell the Hedlund, Ward, Eldridge, and two Chase tracts for $120,000. Tucker made no further contacts with petitioner after he learned that petitioner contracted to sell his land to Derks.

Since petitioners did not own the two Chase tracts and the Eldridge property on that date, the sales agreement provided as follows: "If seller [petitioner] is unable to deliver title to part of parcels 'B' or 'C' [two Chase and Eldridge tracts], purchase price to be reduced proportionately at the rate of $2,000.00 per acre."

Although it was difficult to arrive at a figure, the parties agreed that this $2,000 per acre reduction of the purchase price seemed fair under the circumstances for road frontage in that location.

The Hedlund, Chase, Eldridge, and Chase tracts were all very similar in their characteristics. Petitioner estimated the value of the Ward tract, which was lakefront property and which had buildings on it, at approximately $70,000.

Both of the aforementioned real estate contracts were modified by the parties thereto to effect an extension of each sale to July.

Petitioners finally acquired the following tracts on the dates indicated:

| Property | Date acquired by petitioners |
|---|---|
| Chase (5 acres) | April 1965 |
| Eldridge (13 acres) | May 1965 |
| Chase (12 acres) | April 1965 |

On July 6, 1965, petitioners, who remained in possession of their land until that date, conveyed the Potts property by one deed and conveyed the Hedlund, Ward, Eldridge, and two Chase tracts by another deed to CPC. Both of these deeds were recorded on September 9, 1965.

In the latter part of December 1964, Derks informed William L. Reid (hereinafter Reid), who was assistant to the manager of the land and right-of-way department of CPC at that time, that there appeared to be an interest by Michigan in acquiring some property in Van Buren County. Sometime later, Derks learned of and informed Reid of the newspaper article that appeared in the News-Palladium and also of the option acquired by Michigan on the Drake property, whereupon Derks was instructed to contact the Michigan Department of Conservation to see if some arrangement could be worked out that would permit the State park as well as the plant project to succeed.

In the spring of 1965, an exchange agreement was worked out between Derks and the State of Michigan because CPC needed land for its generating site and the State desired to have some of the lakefront property which CPC had already acquired. The agreement was not designed or intended to reduce the cost to both parties of acquiring land. When the exchange agreement was negotiated, neither the identity of CPC nor the intended use of the property was revealed.

Part of the property to be exchanged by CPC was the Ward tract which it made available for use to the State in the summer of 1965 even though the formal exchange had not yet taken place.

All totaled, approximately 58 tracts of land were acquired by CPC for its generating site in Van Buren County. None of these were condemned by CPC.

Petitioners reported the sale of their property located in Van Buren County on their 1965 Federal income tax return as follows:

## CAPITAL GAIN

### *1965*

| Property | Date acquired | Date sold | Gross sales price | Depreciation allowed or allowable | Basis | Expense of sale | Gain Short term | Gain Long term |
|---|---|---|---|---|---|---|---|---|
| Potts (150 acres) | 4/60 | 7/1/65 | $350,000 | ----------- | $68,000 | $459.80 | ----------- | $281,540.02 |
| Hedlund (4 acres) | 11/61 | 7/1/65 | 5,295 | ----------- | 2,500 | 174.52 | ----------- | 2,620.48 |
| Ward (7 acres) | 9/61 | 7/1/65 | 75,000 | $2,169.76 | 22,796 | 305.41 | ----------- | 54,068.35 |
| Chase (5 acres) | 4/65 | 7/1/65 | 6,615 | ----------- | 3,500 | 218.15 | $2,896.85 | ----------- |
| Eldridge (13 acres) | 5/65 | 7/1/65 | 17,205 | ----------- | 3,050 | 567.19 | 13,587.81 | ----------- |
| Chase (12 acres) | 4/65 | 7/1/65 | 15,885 | ----------- | 3,500 | 523.79 | 11,861.21 | ----------- |
| Totals | | | 120,000 | 2,169.76 | 35,346 | 1,789.06 | 28,345.87 | 56,688.83 |

Taxpayers elect to not recognize gain to the extent of reinvesting the net proceeds in replacement property; Gain is recognized on the Potts land to the extent it was not reinvested.

See the following gain on involuntary conversion schedule _____ 68,788.94

Total net capital gain _____ 68,788.94

## GAIN ON INVOLUNTARY CONVERSION

| Property | Sales price | Expense | Net proceeds | Amounts used for replacement | Gain recognized |
|---|---|---|---|---|---|
| Potts (150 acres) | $350,000 | $459.80 | $349,540.20 | $280,751.26 | $68,788.94 |
| Hedlund (4 acres) | 5,295 | 174.52 | 5,120.48 | 5,120.48 | ----------- |
| Ward (7 acres) | 75,000 | 305.41 | 74,694.59 | 74,694.59 | ----------- |
| Chase (5 acres) | 6,615 | 218.15 | 6,396.85 | 6,396.85 | ----------- |
| Eldridge (13 acres) | 17,205 | 567.19 | 16,637.81 | 16,637.81 | ----------- |
| Chase (12 acres) | 15,885 | 523.79 | 15,361.21 | 15,361.21 | ----------- |
| Totals | 470,000 | 2,248.86 | 467,751.14 | 398,962.20 | 68,788.94 |

## REPLACEMENT PROPERTY

| Purchase date | Name and description | Cost |
|---|---|---|
| 11/65 | K40—40 acres—Chesterton | $85,000.00 |
| 8/65 | 320 Wash.—House—Michigan City | 6,000.00 |
| 8/65 | 255 Mockingbird—House—Portage | 11,350.00 |
| 8/66 | 10¾ acres—Beverly Shores | 12,500.00 |
| 3/66 | Koselke Farm—120 acres—Chesterton | 43,112.20 |
| 4/66 | DuSable Arms—Apt. bldg.—Gary | 241,000.00 |
| Totals | | 398,962.20 |

Respondent disallowed the claimed nonrecognition of gain on the sale and allocated the sale prices as follows:

| Date acquired | Date sold | Kind of property | Gross sales price | Depreciation allowed | Cost or other basis & expense of sale | Gain |
|---|---|---|---|---|---|---|
| | | **Short-term capital gains** | | | | |
| 4/65 | 7/65 | Chase–5A | } $60,000 | } ----------- | $3,718.15 } | $48,640.87 |
| 5/65 | 7/65 | Elridge–13A | | | 3,617.19 | |
| 4/65 | 7/65 | Chase–12A | | | 4,023.79 } | |
| | | Net short-term gain | | | | 48,640.87 |
| | | **Long-term capital gains** | | | | |
| 4/60 | 7/65 | Potts–150A | 350,000 | ----------- | 68,459.80 | 281,540.20 |
| 11/61 | 7/65 | Hedlund–4A | } 60,000 | } 2,169.76 | 2,674.52 } | 36,393.83 |
| 9/61 | 7/65 | Ward–7A | | | 23,101.41 } | |
| | | Other long-term gain per return | | | | 3,655.49 |
| | | Net long-term gain | | | | 321,589.52 |

# 1134

Petitioners reported the sale of certain real property located in Van Buren County, Mich., on their Federal income tax return for 1965. However, they elected not to recognize the gain in connection therewith to the extent reinvested in replacement property on the ground that their real estate was sold under threat of condemnation by a public utility.

Respondent determined that petitioners were not entitled to nonrecognition treatment under section 1033 [3] because the sales in question were not made under threat or imminence of condemnation.[4]

In his opening statement, petitioners' attorney stated as follows:

it is our contention that there was a continuous threat of condemnation from the State of Michigan * * * aimed toward acquiring the land for use as a State Park, and an independent threat of condemnation arising as a result of Mr. Derks' negotiations and statements to the taxpayer.

Before dealing specifically with the contentions of the parties, we must make some preliminary observations concerning a conflict in the testimony of petitioner and of Derks.

Petitioner testified that Derks warned him that although he could not reveal the identity of the party whom he was representing, that party possessed the power to condemn his real property. Petitioner further testified that Derks' statement, coupled with other events occurring in 1964, caused him to sell his real estate to Derks at a price

---

[3] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of * * * condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

*   *   *   *   *   *   *

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph :

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property * * *. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * *

*   *   *   *   *   *   *

(g) CONDEMNATION OF REAL PROPERTY HELD FOR PRODUCTIVE USE IN TRADE OR BUSINESS OR FOR INVESTMENT.—

(1) SPECIAL RULE.—For purposes of subsection (a), if real property (not including stock in trade or other property held primarily for sale) held for productive use in trade or business or for investment is (as the result of its * * * condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted.

[4] There is also disagreement between the parties as to the nature of the two Chase tracts and the Eldridge tract; that is, whether these tracts constituted investment property.

which he would have been unwilling to accept in the absence of such a threat of condemnation.

Derks, on the other hand, denied ever advising petitioner that he represented an undisclosed party who had the power to condemn petitioner's real property.

Having considered every detail of the record and having exercised great care in evaluating the inconsistencies in some of the details of Derk's testimony and some other witnesses, we are unable to conclude that Derks' testimony has been discredited or that he is unworthy of belief. While we are not at liberty to disregard arbitrarily the uncontradicted and unimpeached testimony of a taxpayer, *Jay A. Williams*, 28 T.C. 1000 (1957); *Arthur N. Blum*, 11 T.C. 101 (1948), affd. 183 F. 2d 281 (C.A. 3, 1950), petitioner's testimony herein stands contradicted on its face by the testimony of Derks.

Petitioner was a somewhat voluble and at times evasive witness. Moreover, our impressions of his demeanor in testifying created in us serious doubts as to his sincerity and we remain unconvinced that he was not coloring the material facts to which he testified. See *Quock Ting* v. *United States*, 140 U.S. 417 (1891). Having painstakingly reviewed our impressions of the witnesses in determining the weight to be accorded petitioner's testimony, we are constrained to conclude, and we have found as a fact, that Derks did not in any way indicate to petitioner that he was representing a party who possessed the power to condemn his property.

On brief, petitioner argued in anticipation of our aforementioned finding that such a finding would not be determinative of whether he sold the property in question under threat or imminence of condemnation because there are other events and circumstances which he contends will bring him within the terms of section 1033.

In particular, petitioner points to the following events:

(1) Tucker approached petitioner in early February 1964 in connection with the State of Michigan's interest in acquiring land for a proposed park.

(2) On April 16, 1964, a newspaper article appeared in the News-Palladium describing the State's plans to develop, in conjunction with Van Buren County, a State park in an area where petitioner's property was located.

(3) Tucker met with petitioner on several occasions following the publication of that article and offered to purchase the Ward property for approximately $75,000 or $80,000. Moreover, Tucker discussed with petitioner in general terms the possibility of acquiring the Potts and Hedlund properties. Petitioner brought up the topic of condemnation during one of his meetings with Tucker.

(4) Petitioner alleged that after the appearance of Tucker and the newspaper article, a lot of activity occurred on the Drake tract including the following: Groups of men carrying folded drawings who inspected the Drake property; the placement of newly painted green trash cans on that property; the construction of a two-acre parking lot thereon, as well as the appearance of a drilling rig for the purposes of taking soil samples.

Petitioner argues that in view of the aforementioned circumstances, he felt it was inevitable that the State was going to acquire his property for purposes of devoting it to use as a State park and that he would not be permitted to retain possession of his real estate.

While we reaffirm our prior position that a party who is under threat or imminence of condemnation may sell his property to a person other than the one who has created such threat or imminence and still come within the purview of section 1033, *S. & B. Realty Co.*, 54 T.C. 863 (1970); *S. H. Kress & Co.*, 40 T.C. 142 (1963); *Harry G. Masser*, 30 T.C. 741 (1958), we simply cannot find that petitioner sold the property in question under such a threat or imminence of condemnation to Derks (the other party).

First of all, it is noteworthy that petitioner's portrayal of these events is misleading and lacking in certain crucial facts. In our Findings of Fact, we related what transpired during Tucker's meetings with petitioner. Tucker, after having identified himself as an agent for the State of Michigan, explained to petitioner the State's interest in the proposed park, its funding situation, and its interest in discerning on an exploratory basis which tracts of land were for sale in the area. Moreover, in response to petitioner's inquiries regarding condemnation, Tucker told him of the State's extreme reluctance to exercise its power of condemnation and of its limited history thereof. Tucker indicated to petitioner on several occasions that there was a limitation on the funds available for the proposed park. Furthermore, Tucker brought out in his conversations with petitioner that these funding difficulties and limitations on the State's ability to proceed definitely precluded any possibility of condemnation.

Given these circumstances, we doubt that any reasonable man [5] would construe the events transpiring during 1964 and during the year at issue as signifying that the State was going to acquire petitioner's property for purposes of devoting it to use as a State park and that he would not be permitted to retain possession of it.

We have recently held, as petitioner points out, that section 1033 does not require that the possibility of condemnation be reduced to

---

[5] Although we do not find it necessary on these facts, we would be inclined to apply the standard of a reasonable and experienced realtor in a situation such as this where petitioner had been engaged in the real estate business for approximately 20 years as of the year at issue.

a certainty, noting that "any reasonable construction of the word [threat] must recognize the possibility that the impending, undesirable consequence may never occur." *S. & B. Realty Co., supra* at 870. This language, however, in no way implies that the remote possibility of condemnation is sufficient to constitute a threat or imminence thereof. The facts of the instant case present at the most a remote possibility of condemnation in that Tucker, speaking as agent for the State of Michigan, informed petitioner that its limited funding situation precluded the possibility of condemnation. We agree with petitioner that the fact that Tucker did not tell petitioner that his property would without a doubt be condemned if agreement were not reached on a price for the sale of that property should not in and of itself be construed as precluding the existence of a threat or imminence of condemnation. However, not only did Tucker not tell petitioner that his property would be condemned, but he stated to him that his property would not be condemned in view of the State's funding problems. Therefore, it is clear to us that the compulsion under which the taxpayers acted in *S. & B. Realty Co., supra,* and *Frank O. Maixner,* 33 T.C. 191 (1959), is lacking here.[6] Since petitioner did not have actual notice of, nor could he reasonably infer from the events which occurred, any undesirable, impending consequence, there could be no compelling reason for him to convert his property into cash. Cf. *S. & B. Realty Co., supra,* and *Frank O. Maixner, supra.* Accordingly, we hold that there was no threat or imminence of condemnation at the time petitioner sold the property in question,[7] and therefore petitioners are not entitled to nonrecognition treatment under section 1033.

The foregoing remarks are applicable to the sale of all six [7] tracts of land. However, as to the two Chase tracts and the Eldridge property, there are additional reasons why those three pieces of property were not involuntarily sold by petitioner as a result of threat or imminence of condemnation.

Petitioner did not even own those three properties at the time he contracted to sell them to Derks on January 5, 1965. The sales agreement provided that if petitioner could not deliver title to the two

---

[6] In the *S. & B. Realty Co.* case, we found as a fact that the taxpayer had actual notice that his property would have been condemned had he done nothing. 54 T.C. at 870. Moreover, we specifically stated that the crucial factor therein was that the taxpayer was compelled by the impending consequence of condemnation to take evasive action.

In the *Maixner* case, we noted that we had no doubt that the statements made to the taxpayers by a State representative were taken by them to mean that if they did not enter into the agreements he proposed, their property would be condemned. Moreover, we established a test of reasonableness therein when we stated: "it was reasonable for petitioners to infer that [the State representative] * * * spoke with sufficient authority to make it likely that his threats could and would be carried out if petitioners did not execute the agreements he presented." 33 T.C. at 195.

[7] Potts, Hedlund, Ward, Eldridge, and two Chase tracts.

Chase and Eldridge tracts, the purchase price would be reduced proportionately at the rate of $2,000 per acre. Petitioner, who agreed to sell property which he did not even own and who thereafter acquired that property, even assuming that all the time he knew that there was a threat or imminence of condemnation thereof, cannot be said to have involuntarily converted that property *as a result* of the threat or imminence of condemnation. Moreover, petitioner did not know nor could he have reasonably inferred from the events we have recounted that there was a threat or imminence of condemnation of the Eldridge property and the two Chase tracts. In fact, he knew that condemnation was not likely to occur.

Turning now to the allocation of the $120,000 in sales proceeds to the Ward, Hedlund, Eldridge, and two Chase tracts, petitioner allocated the sales price as follows:

| Property | Sales price |
|---|---|
| Hedlund (4 acres) | $5,295 |
| Ward (7 acres) | 75,000 |
| Chase (5 acres) | 6,615 |
| Eldridge (13 acres) | 17,205 |
| Chase (12 acres) | 15,885 |
| Total | 120,000 |

Respondent determined that $60,000 of the proceeds was attributable to the 30 acres in the two Chase and Eldridge tracts since the sales agreement provided for a reduction of $2,000 per acre if petitioner could not deliver title to part or all of those three properties.

Petitioner contends that the $2,000 figure was in the nature of a penalty for his failure to be able to convey such properties. He testified that he never considered the $2,000 per acre figure as representative of the actual value thereof. Moreover, he testified that he believed the value of the Ward property, which had frontage on Lake Michigan, was approximately $70,000 at the time he sold it. Tucker did offer in 1964 to purchase the Ward property for $75,000 or $80,000.

We agree with petitioner that the $2,000 per acre figure was more in the nature of a penalty for failure to perform the contract than an indication of the value of the two Chase tracts and the Eldridge property. From a careful review of the entire record, we conclude that the value of the Ward property and the portion of the sales proceeds allocable thereto was $70,000. The remaining $50,000 shall be allocated proportionately to the Hedlund, Eldridge, and two Chase properties (34 acres all totaled) since they were very similar in their characteristics and were not lakefront property.

In order to reflect the conclusions reached herein,

*Decision will be entered under Rule 50.*