WILLIAM G. HAY AND KAREN L. HAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; RICHARD F. HOLM AND DOROTHY L. HOLM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hay v. Commissioner
Docket Nos. 27785-89, 27786-89[1]
United States Tax Court
T.C. Memo 1992-409; 1992 Tax Ct. Memo LEXIS 433; 64 T.C.M. (CCH) 228; July 20, 1992, Filed *433 Decisions will be entered under Rule 155. For Petitioners: Gerald W. Gray and David S. Nommay. For Respondent: Shelleyanne W.L. Chang. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: William G. Hay and Karen L. Hay
Docket No. 27785-89
Year Deficiency
1982 $ 14,984
Richard F. Holm and Dorothy L. Holm
Docket No. 27786-89
Year Deficiency [1]
1982 $ 43,154
1983 37,639
1984 21,581
1985 40,775
In an amendment to answer, respondent claimed an increase in the 1982 deficiency of petitioners William and Karen Hay that would result in a total deficiency of $ 46,778. In an amendment to answer, respondent also claimed increases in the 1982, 1983, and 1984 deficiencies of petitioners Richard and Dorothy Holm that would result in total deficiencies for those respective years in the amounts of $ 109,502, $ 49,745, and $ 26,083. William G. Hay and Richard F. Holm were equal partners *434 in a general partnership known as H-H Ranch. The partnership owned a tract of land known as Whiskey Shoals. Most of Whiskey Shoals had been subdivided into residential lots. In January 1982, the partnership sold this land to the California Coastal Conservancy in a bargain-sale transaction. The partnership reported the transaction as a sale of a capital asset and reported the bargain element as a charitable contribution. The partnership did not report a gain on the sale because it claimed entitlement to the nonrecognition provisions of section 1033. [2]
The issues we must decide are: (1) Whether the land sold by the partnership was a capital asset; (2) the amount of the charitable contribution attributable to the bargain sale; and (3) whether the sale qualifies under the provision of section 1033 permitting nonrecognition *435 of gain. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time they filed their petitions in these cases, petitioners William and Karen Hay resided in Gualala, California, and petitioners Richard and Dorothy Holm resided in Santa Rosa, California. Each set of petitioners filed joint Federal individual income tax returns for the years in issue. Petitioner William G. Hay (Mr. Hay) and petitioner Richard F. Holm (Mr. Holm) were each 50-percent partners in H-H Ranch (the partnership). In 1970, the partnership purchased a tract of coastal area land known as Whiskey Shoals. Whiskey Shoals consisted of approximately 45 acres located in Mendocino County, California. Whiskey Shoals lies north of the San Francisco Bay area long California Highway One and is an approximate 3-hour drive from the Bay area. The partnership subdivided approximately 31 acres of the Whiskey Shoals property into 71 lots. Streets and utility improvements were completed. The partnership constructed one house in the Whiskey Shoals subdivision for use as a model home and sales office. This *436 house was later sold and used as a single-family residence. No other houses were built at Whiskey Shoals. The partnership began selling lots in 1972. The partnership had sold 21 of the 71 lots by 1973. No further lot sales occurred during the period from 1973 through January 1982. In November 1972, California voters passed Proposition 20, the California Coastal Zone Conservation Act. This legislation set criteria for the enhancement, preservation, protection, and restoration of the ecology and environment of the coastal zone. The Act established the California Coastal Commission (hereafter the State Commission), which was required to submit a plan to protect the coastal zone's ecology and environment to the California State legislature. The Act also prohibited any further development within the prescribed coastal permit area without a permit by the State or regional coastal commissions and prescribed standards for issuance or denial of such permits. In 1973, the newly created State Commission imposed a moratorium on the issuance of building permits for lots in the Whiskey Shoals development. Upon the passage of Proposition 20, several coastal subdivisions, including Whiskey *437 Shoals, entered into a prolonged period of uncertainty as to the extent of the development that would ultimately be permitted. Many months, and sometimes years, passed until a resolution was reached as to whether landowners in the particular coastal subdivision would be allowed to continue lot sales or to construct houses on lots previously sold. With respect to the Whiskey Shoals development, this period of uncertainty persisted for 9 years until the land in the development was sold to the California Coastal Conservancy on January 8, 1982. [3] However, during this 9-year period, building permits were being granted with respect to certain other coastal area developments. In 1974, Mr. Hay applied for a permit to *438 build a single-family residence on a lot in the Whiskey Shoals subdivision. The permit application was denied by the North Coast Regional Commission (hereafter the Regional Commission). The adverse decision was appealed to the State Commission, which upheld the Regional Commission's denial of the building permit. In late 1974, another Whiskey Shoals lot owner applied for a building permit to construct a residence. The Regional Commission approved the application. That decision was appealed to the State Commission which denied the application based upon the adverse impact on the "view shed". The State Commission further determined that any development in the Whiskey Shoals area required careful planning and review to assure compatibility with the policies of the State coastal plan. The partnership subsequently brought suit seeking to overturn the State Commission's denial of the second permit application. The partnership lost this case. In 1975, the State Commission submitted a final coastal plan to the Governor of California and the California State legislature, resulting in the enactment of the California Coastal Act of 1976. The Coastal Act of 1976 established a local *439 coastal plan process for the purpose of returning control of coastal zone land use to local jurisdictions. The State coastal plan, submitted by the State Commission, contained the following statement with respect to the Whiskey Shoals development: Whiskey Shoals - To reduce visual impact and to prevent the inappropriate use of this area, the Whiskey Shoals subdivision should, as an immediate priority be acquired for open space and agricultural use. Subsequent to the adoption of the coastal plan, the Whiskey Shoals subdivision was given an "A-A" high-priority public recreation ranking on the State Commission's March 1976 recommended acquisition list. The California Coastal Act of 1976 established the California Coastal Conservancy (hereafter the Conservancy). The Conservancy is an environmental restoration agency that seeks to acquire and restore select coastal area properties. It has limited funds with which to finance acquisitions. It has no regulatory authority, nor does it possess the power of eminent domain for acquiring coastal properties. In 1977, the State and Regional Commissions' staff met with a representative of the partnership to discuss possible alternatives *440 for the development of the Whiskey Shoals land. The alternatives discussed ranged from permitting development under the partnership's original subdivision plan for building 71 houses on the existing lots to a complete elimination of the existing lots by public purchase and a reversion to acreage. Also among the alternatives was reducing the size of the subdivision by consolidating some of the existing lots or placing residential units into groups in order to reduce the impact on the view from the State highway bordering the property. In a June 24, 1977, letter to the partnership's representative, the State Commission's executive director reviewed the alternatives for development discussed by the State and Regional Commissions' staffs. The letter reiterated substantial concerns about permitting development. Although the State Commission recommended that the Whiskey Shoals subdivision property should be acquired by the State of California, no California State government agency was then actually interested in making such an acquisition. At the suggestion of the State Commission, the partnership approached the California Division of Parks and Beaches about acquiring the Whiskey *441 Shoals property. In late 1977 or early 1978, the partnership, on its own initiative, approached the Conservancy about the possibility of the Conservancy's acquiring the property. In 1978, the Conservancy began studying possible solutions for preserving and protecting the open space and scenic resources of the Whiskey Shoals subdivision area. On January 22, 1979, the Conservancy proposed a restoration plan for the consolidation of the lots and redesign of the Whiskey Shoals subdivision into a complex consisting of 50 clustered, residential condominium units. The 50 units would include 40 three-bedroom units and 10 two-bedroom units. The number of condominium units in the plan was subsequently increased to 55 units. The Conservancy's restoration plan was submitted to the State Commission for its review and approval. Although the proposal eventually received recommendations from the State Commission, the Regional Commission, and the Sierra Club, the plan still required the approval of the Mendocino County Board of Supervisors. The Conservancy's restoration plan contemplated that the Conservancy would purchase the Whiskey Shoals land. In February 1979, the Conservancy retained *442 Bruce Harding, a real estate appraiser, to appraise the 71 Whiskey Shoals subdivision lots. In his appraisal report, Mr. Harding determined the 71 lots to have an estimated total value of $ 1,525,000 as of March 1, 1979. He valued the partnership's 50 lots at $ 1,054,000 and the 21 lots owned by other individuals at $ 471,000. In March 1979, the Conservancy authorized its staff to commence negotiations to acquire the Whiskey Shoals subdivision. The Conservancy recognized that, unless Mendocino County approved the proposed condominium plan, the Conservancy would have no assurance of recouping its investment. As a result, the Conservancy's acquisition of the Whiskey Shoals land was to be conditioned upon the approval of the proposed plan by the State Commission and Mendocino County. The acquisition was further to be conditioned upon all landowners in the Whiskey Shoals subdivision agreeing to sell their property to the Conservancy. The Conservancy began negotiations with the partnership and owners of the other 21 lots. In the initial discussions, the Conservancy indicated that it had limited financial resources and could afford to pay only $ 1 million for the Whiskey Shoals *443 land. Conservancy officials suggested that the seller could claim a charitable deduction for Federal income tax purposes for the amount by which the value of the property exceeded the amount which the Conservancy could pay. While awaiting approval of its proposed restoration plan by Mendocino County, the Conservancy selected a private real estate development company to be the project sponsor of the proposed Whiskey Shoals condominium project. The Conservancy and the private development company entered into an agreement requiring the private company to develop the project consistent with the Conservancy's restoration plan and to purchase the site from the Conservancy after the Conservancy had acquired the land. The agreement, however, was subject to the Conservancy's restoration plan's being approved by the Mendocino County supervisors. After holding a public hearing on the plan, the Mendocino County Planning Commission recommended that the county supervisors deny approval of the Conservancy's proposed restoration plan. This recommendation was based on the following findings: That the proposal in itself is inconsistent with specific portions of the Coastal Act and adopted and *444 approved policies of a pending and proposed Local Coastal Plan for Mendocino County. Some of the policies being inconsistency [sic] with the substantial development outside the urban boundaries, inconsistency [sic] with requirements for development subordinate to scenic and viewshed areas along the coast as well as other sections of the proposed Local Coastal Plan; It is a legal subdivision, one in which the County will, when the Local Coastal Plan is certified, issue the permits; The concensus of the Planning Commission is that they believe that the problem was created by the State of California Coastal Commission and should be resolved by that body. The Commission urges and requests that the State Coastal Conservancy, as an arm of the State Coastal Commission, acquire at the earliest possible time the Whiskey Shoals Subdivision and reimburse those property owners that have had equity in it for the past nine years because of an act by the State of California. On October 26, 1981, the county supervisors rejected the Conservancy's plan. Subsequently, a meeting was held with California State Senator Barry Keene, Conservancy staff members, employees of the private developer *445 selected by the Conservancy, members of a citizen's group, and representatives of Mendocino County. As a result of the meeting, all parties agreed to work together to devise an alternative to the Conservancy's proposed 55-unit condominium project. The parties further agreed that if an alternative project could not be devised, then the 55-unit condominium project proposed by the Conservancy would be implemented but that sufficient time would be allowed in the implementation of the project to permit further opportunity for devising an alternative to the project. In December 1981, the Mendocino County supervisors approved a tentative subdivision map for Whiskey Shoals that would convert the existing 71-lot subdivision (with the exception of the single lot on which a house was already built) into a 55-unit planned development. The county supervisors' approval was conditioned on the execution of the following: 1. An agreement among the Conservancy, the county, and the private developer providing that the Conservancy would not file a final subdivision map until December 1982, that if the county developed an alternative project for the site before December 1982, the Conservancy would *446 not file a final map, and that three alternatives to the proposed 55-unit development would be formulated. 2. An agreement among the Conservancy, the county, and the California Department of General Services granting the county an option to purchase the Whiskey Shoals property and providing that the county's purchase of the property under the option would be subject to legal restrictions to preserve scenic views and public access through Whiskey Shoals to the coastline. To preempt development of the condominium project under either agreement, the county was required to establish that the alternative project (1) was economically feasible and (2) was approved by all the necessary regulatory agencies. If it did preempt development of the condominium project, the county was also required to furnish assurances that the Conservancy would recoup its investment in Whiskey Shoals, with interest, by December 31, 1985. On January 8, 1982, the partnership sold its land at Whiskey Shoals to the Conservancy for $ 1 million. The land sold included the 50 subdivision lots, a parcel containing approximately 1-1/2 acres, and a parcel known as Moat Creek containing approximately 13 acres. In *447 addition, the Conservancy acquired certain easements over other neighboring properties owned by the partnership, for purposes of providing access and to treat and discharge sewage wastes. The Conservancy ultimately was not successful in its plan to develop a 55-unit condominium project on the Whiskey Shoals area property. The record is sketchy concerning the circumstances that caused the Conservancy to delay and eventually abandon development of the condominium project. The tentative map for the project, which had been approved by the Mendocino County supervisors, however, expired in December 1984. The entire 45-acre Whiskey Shoals tract was subsequently divided into 13 residential lots. As of February 1989, the State of California was in the process of selling the 13 lots to private individuals. In July 1978, the partnership purchased an 8,000-acre ranch known as the Hillside Ranch at a cost of $ 802,073. The ranch was located northwest of Santa Rosa, California. The property had a residence and several outbuildings and fences. At the time the partnership purchased the Hillside Ranch, the property was being used as a ranch. The partnership has continued to use the property *448 for raising cattle and sheep. On its 1982 return, the partnership reported a charitable contribution of $ 1,322,643 as a result of the January 8, 1982, bargain sale to the Conservancy. The partnership's return contained the following explanation: [The partnership] * * * purchased this land in 1970; its basis is $ 366,174.85. The land was appraised at a fair market value of $ 3,020,000 as of December 23, 1981 * * * and was sold to the State Coastal Conservancy for $ 1,000,000 * * *. 1. Fair market value (per
3,020,000
appraisal)
2. Portion of property
deemed to
have been contributed:
Value of contributed
2,020,000
property
Total fair market value
3,020,000
=66.89%
3. Bargain sale
contribution deduction:
Total fair market value
3,020,000
Contribution portion
X  66.89%
2,020,000
2,020,000
Total basis
413,528.28
Contributed portion
X   66.89%
276,608
Long-term gain, if sold
for $ 2,020,000
1,743,392
X     40%
Less 40% 697,357
Total charitable
contribution
(50% Limitation)
[1] $ 1,322,643
*449 The partnership further elected to defer recognition of the taxable gain with respect to its sale of the Whiskey Shoals land under section 1033. The return stated that the Hillside Ranch, acquired in July 1978, was the qualified "Like-Kind" replacement property and that it was purchased subsequent to the time the partnership's Whiskey Shoals land was placed under threat of condemnation. In the notices of deficiency, respondent determined that no charitable contribution deduction was allowable with respect to the partnership's sale of the Whiskey Shoals land. The notices of deficiency explained that the partnership had not established that it had a donative intent, or that the land had a value in excess of the price the partnership received. Respondent further determined that the sale of the Whiskey Shoals land did not qualify as an involuntary conversion under section 1033. Alternatively, respondent determined that, even if the sale of the land to the Conservancy was an involuntary conversion, the partnership's purchase of the ranch property in July 1978 was not the purchase of a qualified replacement property. In amended answers, respondent alleged the Whiskey Shoals land *450 was held primarily for sale to customers in the ordinary course of the partnership's business and that the gain must be taxed as ordinary income. OPINION Whether the Partnership's Land Was a Capital Asset
Respondent takes the position that the Whiskey Shoals property was not a capital asset, that any gain was ordinary income, and that the amount of any charitable contribution must be reduced under section 170(e) by the amount of ordinary income that would have been produced had the partnership sold the land for its fair market value. Section 1221(1) provides that property held by the taxpayer, primarily for sale to customers in the ordinary course of the taxpayer's trade or business, is not a capital asset. This Court has held that whether property is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business is a question of fact. Guardian Industries Corp. v. Commissioner, 97 T.C. 308, 315-316 (1991); Cottle v. Commissioner, 89 T.C. 467, 486 (1987); see also Byram v. United States, 705 F.2d 1418, 1421-1424 (5th Cir. 1983); Redwood Empire S & L Association v. Commissioner, 628 F.2d 516, 517-520 (9th Cir. 1980), *451 affg. 68 T.C. 960 (1977). Generally, it is the taxpayer's purpose in holding the property at the time of sale that must be determined. It has been recognized that the purpose for which a taxpayer holds property can change. Guardian Industries Corp. v. Commissioner, supra at 316; Cottle v. Commissioner, supra at 487; Daugherty v. Commissioner, 78 T.C. 623, 629 (1982); Maddux Construction Co. v. Commissioner, 54 T.C. 1278, 1286 (1970). In making this determination, the following factors are considered: (1) The nature and purpose of the acquisition and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of the supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. Further, the taxpayer's *452 income from other sources can be significant in certain cases. These factors have no independent significance; they merely serve to assist the finder of fact in determining, on the basis of the record as a whole, the taxpayer's purpose in holding the property. Byram v. United States, supra at 1424; Guardian Industries Corp. v. Commissioner, supra at 316-317; Cottle v. Commissioner, supra at 487-488. Whether the Whiskey Shoals land was held primarily for sale to customers in the ordinary course of the partnership's business was first raised in respondent's amendment to answer. Respondent, therefore, bears the burden of proof. Rule 142(b). Respondent argues that the partnership developed and held the Whiskey Shoals lots for sale to others, that this purpose never changed, and that the partnership continued to hold the property as stock in trade or primarily for sale to others. In 1973, the State Commission imposed a moratorium on the issuance of building permits for lots in the Whiskey Shoals development. The resulting uncertainty concerning whether lot owners would be allowed to construct houses persisted *453 until the land was sold by the partnership to the Conservancy in January 1982. Although the partnership technically may not have been prohibited from selling its remaining subdivision lots to third parties, no one was interested in purchasing the lots because of the building permit moratorium. While the partnership had attempted to challenge the moratorium, the partnership had not succeeded. By 1977, the partnership wanted the State of California to purchase the Whiskey Shoals subdivision. The partnership had previously expended considerable sums in acquiring the land, constructing streets, and making utility improvements, and the partnership was under financial pressure. The partnership had received notes from the purchasers of the 21 subdivision lots, which had been sold, but had forgone payment on these notes. While the partnership originally held the Whiskey Shoals land primarily for sale to customers in the ordinary course of its business, the determinative question is the partnership's holding purpose as of January 8, 1982. For 9 years, the partnership was unable to sell lots. Based on the record, we conclude that respondent has failed to prove that, on January 8, 1982, *454 the partnership held the Whiskey Shoals property primarily for sale to customers in the ordinary course of its business. Therefore, the gain realized on the sale of the Whiskey Shoals property is not to be treated as ordinary income. Amount of the Charitable Contribution
Section 170 generally provides a deduction for any charitable contribution made to a qualified charity. Where a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution, subject to certain reductions. Sec. 1.170A-1(c)(1), Income Tax Regs.
"Fair market value" is defined as the price at which the property would change hands between a willing buyer and a willing seller, where neither is under any compulsion to buy or to sell and where both have reasonable knowledge of the relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.
In determining fair market value, real property should be valued to reflect the highest and best use of the property on the date of the valuation. Frazee v. Commissioner, 98 T.C.    ,     (1992) (slip op. at 16); Symington v. Commissioner, 87 T.C. 892, 896 (1986); *455 Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). In Frazee v. Commissioner, supra at     (slip op. at 16), we determined that the highest and best use of the real property involved therein was industrial use and elaborated as follows: In determining the highest and best use, and in turn the fair market value of property, "the realistic, objective potential uses" of the property control. Stanley Works v. Commissioner, supra at 400. The highest and best use of property is the "reasonable and probable use that supports the highest present value". Symington v. Commissioner, supra at 897. To determine what uses are reasonable and probable, we focus on "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." Olson v. United States, 292 U.S. 246, 255 (1934). The fair market value of property is not affected by whether the owner has actually put the property to its highest and best use, nor whether he ever intends to do so. Stanley Works v. Commissioner, supra at 400. *456 Therefore, it is irrelevant that * * * [the taxpayers] never intended to develop the property into an industrial use. If it is reasonable and probable that the * * * [subject] property could be rezoned to an industrial use and that there was a demand for industrial property within a reasonable proximity to the * * * [valuation date], this must be factored into the valuation. On brief, respondent essentially concedes that the partnership made a charitable contribution but disputes that the fair market value of the partnership's land was $ 3,020,000. Respondent claims that the fair market value of the land was only $ 1.25 million. Each party relies heavily on appraisals made by their respective experts. Respondent's expert, Robert H. Shaw, determined that the fair market value of the partnership's land (50 subdivision lots, 1-1/2 acre parcel of land, and Moat Creek parcel) was $ 1.25 million as of January 8, 1982. This figure is based on the assumption that the highest and best use of the entire 45-acre Whiskey Shoals tract (which included the partnership's land and the 21 other subdivision lots owned by third parties) was to subdivide it into 9 residential parcels of approximately *457 5 acres each. Mr. Shaw noted that Mendocino County had previously proposed rezoning the Whiskey Shoals subdivision to permit only one house for every 5 acres. Yet, he also acknowledged that, because of its prior history and previously approved status as a 71-lot residential subdivision, the property "has the distinct advantage of probable approval for a higher density development than any of the * * * [comparable sales parcels]." Mr. Shaw further recognized that the improvements made to the property added to its value. Mr. Shaw performed his appraisal in 1989, over 7 years after the transaction in issue took place. We consider Mr. Shaw's appraisal to be unduly pessimistic with respect to the highest and best use of Whiskey Shoals. In determining the highest and best use of property, a potential use can be considered even though such potential use is prohibited on the valuation date. See Ebben v. Commissioner, T.C. Memo. 1983-200, affd. on this issue 783 F.2d 906, 910 (9th Cir. 1986). A potential highest and best use may be considered if there is a strong possibility of its achievement, and such use is not remote, speculative, or conjectural. *458 See Olson v. United States, 292 U.S. 246, 257 (1934); McGovern v. New York, 229 U.S. 363, 372 (1913); see also Fiske v. Commissioner, T.C. Memo. 1984-494; Crock v. Commissioner, T.C. Memo. 1983-351. In such cases, it is appropriate to reduce or discount the value by a reasonable estimate of the cost of removing the restriction and for the time needed to accomplish such removal. Thornton v. Commissioner, T.C. Memo. 1988-479. See generally the discussion in Frazee v. Commissioner, 98 T.C.    ,     (1992) (slip op. at 16-20, 40-41). In December 1981, shortly before the partnership's January 8, 1982, bargain sale to the Conservancy, Bruce Harding was retained by petitioners to perform an appraisal of the Whiskey Shoals property. In contrast to Mr. Shaw's appraisal, which was made over 7 years after the transaction in issue, Mr. Harding's appraisal was made within days of the relevant valuation date. Mr. Harding determined the fair market value of the partnership's land to be $ 3,020,000 as of December 28, 1981. He valued the partnership's 50 subdivision lots at $ 2,410,000, *459 the 1-1/2 acre parcel of land at $ 60,000, and the Moat Creek parcel at $ 550,000. Mr. Harding's December 1981 appraisal was not his first appraisal of the Whiskey Shoals property. Mr. Harding had performed two previous appraisals of the Whiskey Shoals lots for the Conservancy. The Conservancy obtained these appraisals for purposes of its contemplated purchase of the property. The first appraisal was done in February 1979. Mr. Harding determined that, as of March 1, 1979, the partnership's 50 lots were worth $ 1,054,000, and the 1-1/2 acre parcel was worth $ 20,000. Seventeen months later, in August 1980, the Conservancy requested that Mr. Harding update his appraisal. In his updated appraisal, Mr. Harding determined that the same property had a value of $ 1,317,500 as of August 1, 1980. Neither of these appraisals included a value for the 13-acre Moat Creek parcel. In his valuation report dated March 1, 1979, Mr. Harding notes the uncertainty created by the activities of the State Commission. Nevertheless, he concludes that "the primary best use is estimated to be for construction upon the existing lots, but only after an additional waiting period for development of the *460 coastal plan policy." He noted that the State Commission staff had recognized that the precedential effect of the one residence already built in the Whiskey Shoals subdivision would greatly prohibit future denials of permits for similar houses. The Conservancy asked for a review of Mr. Harding's appraisal by the Real Estate Services Division of the Department of General Services. In response, the senior land agent of that department concluded that "Although the opinions expressed by Mr. Harding could be argued, I feel that his logic, analysis and conclusions are reasonable." Mr. Harding's valuations for the Conservancy included a present value discount for the estimated period of uncertainty regarding development of the property. In his December 1981 appraisal, he applied a discount factor of 20 percent per annum for the 6-month period he estimated it would take to resolve Whiskey Shoals' development status. Mr. Harding concluded that if the Whiskey Shoals land was not purchased by the Conservancy and developed into the proposed condominium project, "it is estimated that the property will retain its residential zoning, and that single family residential construction will be allowed *461 to get under way". Mr. Harding also concluded that there was insufficient market data to value the property if it were developed as the 55-unit condominium project that was then being proposed by the Conservancy. In October 1981, the Mendocino County Planning Commission had denied the Conservancy's application for approval of a 55-unit condominium project. With respect to Whiskey Shoals, the Mendocino County Planning Commission found that "It is a legal subdivision, one in which the County will, when the Local Coastal Plan is certified, issue the permits". At the time the Mendocino County Planning Commission made these findings, the Whiskey Shoals subdivision was still zoned as a 71-home subdivision. The Mendocino County supervisors subsequently rejected the condominium project proposed by the Conservancy. However, in December 1981, the county supervisors gave their tentative approval to the condominium project which required the Conservancy to acquire the Whiskey Shoals property. A number of conditions were imposed which would allow further time for formulating alternatives that would permit more of the property to be preserved as open space. We believe that substantial weight *462 must be given to Mr. Harding's consistent determinations that the highest and best use of the Whiskey Shoals property was for the construction of individual residences on the existing 71 lots. Mr. Harding recognized that there was some uncertainty about obtaining permits for such use but, nevertheless, found that this was the most likely use. Mr. Harding's appraisals were made during the period of time when the Conservancy was considering the purchase of Whiskey Shoals. We believe that Mr. Harding's contemporaneous determinations of highest and best use better reflect what a prospective buyer and seller would have believed at the time of the actual sale. Mr. Harding's first two appraisals were made for the Conservancy. As a prospective purchaser, the Conservancy had no interest in inflating the value of Whiskey Shoals. Nevertheless, it did not dispute Mr. Harding's determination of the highest and best use, and the Real Estate Services Division of the California Department of General Services approved Mr. Harding's analysis. Respondent alleges that when Mr. Harding was working for the State of California, he "arrived at a low value to enable the State to purchase Whiskey Shoals *463 with the limited funds it had available." Respondent's characterization of Mr. Harding's appraisals for the State as "low" is interesting when one considers that Mr. Harding's August 1980 valuation of the partnership's 50 lots and the 1-1/2 acre parcel was $ 1,342,500, as opposed to respondent's valuation of $ 1,250,000 for the 50 lots and 1-1/2 acre parcel plus the 13-acre Moat Creek parcel. Mr. Harding's appraisal of $ 1,342,500 was made approximately 1-1/2 years prior to the actual sale date. It is undisputed that the value of the property was increasing during this period, [4] and Mr. Harding's August 1980 appraisal did not even include the 13-acre Moat Creek parcel and the easements which were included with the property sold by the partnership on January 8, 1982. Nevertheless, respondent asks us to accept her valuation of $ 1.25 million for all the partnership's Whiskey Shoals property. This we decline to do. *464 Even though we accept Mr. Harding's determination of highest and best use and find flaws in respondent's position, we do not fully accept Mr. Harding's valuation. We note that in making his 1979 and 1980 valuations, Mr. Harding utilized comparable sales of lots in another coastal subdivision called Irish Beach, which was located in the Point Arena area and which was in fairly close proximity to Whiskey Shoals. Yet, for purposes of his December 1981 appraisal for the partnership, he utilized comparable sales in Bodega Harbour and Oceana Marin, which were subdivisions superior to Whiskey Shoals and much closer to the San Francisco Bay area. On cross-examination, Mr. Harding appeared to agree that Irish Beach sales were the best comparable sales. He was somewhat vague in offering any explanation as to why he had not used such sales for purposes of making his December 1981 appraisal, but seemed to imply that no sales of Irish Beach lots had occurred since he performed his August 1, 1980, valuation. However, another expert witness for petitioners testified that lots were still being offered for sale in the Irish Beach development. [5] Although Mr. Harding made adjustments to take *465 into account the superior qualities of the lots in the Bodega Harbour and Oceana Marin subdivisions, we are not convinced the adjustments were adequate. We also believe that Mr. Harding overvalued the 1-1/2 acre parcel and the Moat Creek parcel. Mr. Harding's appraisal report contains little justification for his $ 60,000 valuation of the 1-1/2 acre parcel, which was three times the value that he determined as of March 1979. The description of the Moat Creek property, the fact that it was never subdivided nor previously valued, and Mr. Shaw's testimony that its suitability for residential use was very limited lead us to believe that Mr. Harding's $ 550,000 valuation was excessive. Respondent's *466 expert valued the Whiskey Shoals land at $ 1.25 million and petitioners' expert valued it at $ 3,020,000. Based on the evidence, we find that the partnership's land had a fair market value of $ 2.25 million as of January 8, 1982. In arriving at this figure, we have taken into account the uncertainty that existed as of the valuation date concerning the highest and best use of the property as well as the delay and expense that a willing buyer would anticipate in connection with obtaining the necessary clearance for construction of houses in accordance with the existing zoning. Whether Section 1033 Permits Nonrecognition of the Taxable Gain
Section 1033 permits a taxpayer to defer recognition of gain from the sale of property if the sale is made under threat or imminence of condemnation and if certain requirements as to reinvesting the sales proceeds are met. The owner must generally purchase qualified replacement property that is "similar or related in service or use" to the converted property. If the property is real property used in a trade or business (other than property held primarily for sale), the replacement property will qualify if it is "property of a like kind." *467 Sec. 1033(g). The earliest time for replacement is the date of the threat or imminence of condemnation. A taxpayer must generally replace the property within 2 years of the close of the first taxable year in which any part of the gain is realized. The threat or imminence of condemnation exists: (1) If the owner is informed by a reliable source that an entity with the authority to condemn has decided to acquire the property for public use; and (2) if there are reasonable grounds to believe condemnation of the property will be carried out. Maixner v. Commissioner, 33 T.C. 191 (1959). The threat of condemnation does not exist where the surrounding circumstances indicate the chance of condemnation was remote. Warner v. Commissioner, 56 T.C. 1126 (1971), affd. without published opinion 478 F.2d 1406 (7th Cir. 1973). Petitioners have failed to establish that the Whiskey Shoals property was under the threat of condemnation or that condemnation was imminent when they purchased the Hillside Ranch in July 1978. Mr. Holm testified that the partnership was seeking to have the State of California acquire the Whiskey Shoals land. *468 In early 1978, the partnership approached the Conservancy about acquiring the land. Mr. Holm related that he had initially contacted Joseph Petrillo, the Conservancy's executive officer, to discuss the matter. Mr. Holm stated that in their initial discussions, Mr. Petrillo had told him that the Conservancy could not afford to pay more than $ 1 million. [6]
*469 Although Mr. Petrillo mentioned to Mr. Holm that the Conservancy possibly could arrange to acquire the partnership's land by having another State agency possessing the power of eminent domain condemn the land, it could not reasonably be believed that the partnership's land was under any actual threat of condemnation. Decisions will be entered under Rule 155.
Footnotes
1. This Court granted petitioners' Motion to Consolidate on Jan. 7, 1991.↩
1. Respondent also determined that petitioners Richard and Dorothy Holm were liable for various additions to tax and increased interest but subsequently conceded these items.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. From 1970 through January 1982, the 71 lots in the Whiskey Shoals subdivision continued to be zoned by Mendocino County as R-1 for single-family residential use. However, since the passage of the California Coastal Act of 1976, the county had been in the process of reformulating its general zoning plan.↩
1. Election is hereby made under IRC Section 170(b)(1)(c)(iii)↩ to reduce the contribution by 40% of the would be long-term gain and to apply the 50% limitation.
4. The report of respondent's expert valued the partnership's Whiskey Shoals property at $ 1 million as of April 28, 1981, and at $ 1.25 million as of Jan. 8, 1982.↩
5. This expert did not offer his own valuation of the partnership's land. He merely offered the opinion that Mr. Harding's appraisal was performed in a reasonable fashion. However, he acknowledged that Mr. Harding's failure to use the Irish Beach lot sales as comparable sales in the December 1981 appraisal could be "a problem".↩
6. The following is an excerpt of Mr. Holm's trial testimony: Q. [Petitioners' counsel]: Did you ever approach the Coastal Commission seeking relief from this moratorium? A. Repeatedly. Yes. Q. And what was the result of those visits? A. They denied the permits, and they maintained that the property should be acquired by a state agency. Q. Did they specify a state agency? A. No. They indicated that perhaps we might check with the Division of Beaches and Parks, which we did. Q. And what was the result of that approach? A. The Division of Beaches and Parks, which was the only entity then in existence with the power of eminent domain, and they had an acquisition list, but we were not on it. * * * Q. Did you ever contact anybody with the * * *Coastal Conservancy after it was enacted or came into being? A. Immediately, yes. Q. Do you recall about when that was? A. 1977, or it might have been as late as early 1978. Q. And who did you meet with with (sic) the Coastal Conservancy. A. Mr. Petrillo. Q. Did you discuss the Coastal Conservancy's acquisition of Whiskey Shoals? A. We did. Q. And what did Mr. Petrillo tell you in that regard? A. We were one of the first people to contact Mr. Petrillo, the Coastal Conservancy. He explained that they were a fledgling organization. He was interested in acquiring Whiskey Shoals, but he explained that they only had limited funds. Q. Did he tell you how much those limited funds equated to? A. He said that they could only afford to pay $ 1 million. Q. Did he discuss with you what might happen if the value of Whiskey Shoals exceeded $ 1 million. A. We discussed that we would make a gift to the state. * * * * Q. Okay. Did you have similar discussions with Donald Rubinstein [another Coastal Conservancy employee]? A. Yes, we did.↩